Filed 9/11/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL MAURICE JOHNSON,<br><br>    Defendant and Appellant. | F066627<br><br>(Super. Ct. No. CRM021171)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  John D. Kirihara, Judge.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Kathleen A. McKenna, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

Defendant Daniel Maurice Johnson, a ward of the juvenile court, was charged with two counts of felony possession of a firearm (Pen. Code,[1] former § 12021, subd. (e), & § 29820, subd. (b); counts 1 & 4), two counts of felony possession of ammunition (former § 12316, subd. (b)(1), & § 30305, subd. (a)(1); counts 2 & 5), and two counts of active participation in a criminal street gang (§ 186.22, subd. (a); counts 3 & 6).[2]  On December 6, 2012, the jury convicted him on all counts.  On February 1, 2013, the trial court denied probation, sentenced defendant to two years eight months in prison on counts 3 and 6,[3] and stayed execution of punishment on the remaining counts.[4]

On appeal, defendant contends that the evidence did not sufficiently support his convictions for gang participation on counts 3 and 6.  In view of *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*), we reverse these convictions because substantial evidence did not establish that defendant promoted, furthered, or assisted in the perpetration of felonious conduct by at least two gang members.

## STATEMENT OF FACTS

### I.    Prosecution case-in-chief

a.    *Counts 1 through 3*

On September 9, 2011, around 1:00 a.m., Officer Moses Nelson observed defendant, Steven Mays, Jr.,[5] and Clemmon High[6] wearing "dark" and "heavy" clothing

---

[1]    Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2]    Section 12021, subdivision (e), has since been recodified as section 29820; section 12316, subdivision (b), has since been recodified as section 30305, subdivision (a).

[3]    The court imposed the middle-term sentence on count 3 and one-third of the middle-term sentence on count 6.

[4]    The court also awarded 781 days of credit for time served.

[5]    Defendant admits in his appellate brief that Mays is a "hardcore" Merced Gangster Crip.

[6]    At trial, Officer Joseph Henderson testified that High was a "validated Crip gang member."

2.

and walking northbound on G Street near a gas station. As Nelson approached in his patrol vehicle, the three men, who were originally "within four or five feet of each other," huddled "within 18 inches to two feet from each other." Nelson shined the spotlight on the group, recognized Mays[7] as a juvenile parolee and documented Merced Gangster Crip, and sounded the air horn. The three men continued to walk. Nelson exited the vehicle and ordered them to stop. Defendant and High "took three or four steps and stopped" while Mays, who was ahead of them by at least seven feet, continued to walk until Nelson yelled at him a second time. Nelson asked defendant if he was on parole and defendant answered, "Yeah. I'm on parole." Aware of Mays's history of firearm-related offenses, Nelson drew his weapon and radioed for backup. Other officers arrived on the scene and detained the three men. Based on "how fast they were walking and didn't want to stop," Nelson suspected that defendant, Mays, and High were "trying to create space" and retraced their steps on G Street. He found a loaded .22-caliber revolver next to the gas station. Subsequent DNA testing of the firearm revealed a mixture containing defendant's alleles.[8]

Defendant made three jail calls between September 9 and 10, 2011.[9] In the first call, Tyriqa Turner,[10] his girlfriend, asked, "Danny, did they caught you with a gun?" Defendant replied, "Yeah." He recounted:

"As soon as we stepped outside—as soon as we stepped outside. We went down the stairs, I told him, I'm like, 'Hey cuz,[11] nigger, we tripping.' I'm

---

**7**      In this opinion, we refer to Steven Mays, Jr., as Mays. To avoid confusion, we identify individuals who share the same surname by their full names.

**8**      Testing also confirmed that Mays's and High's alleles were not present in the mixture. Therefore, the two were excluded as contributors.

**9**      The jury listened to a recording of these calls.

**10**      At trial, Officer Kennon Sayachak testified that Turner was not a validated gang member.

3.

like, 'I just thought about it. You said you seen hella police.' I'm like, 'Nigger, I'm getting text messages saying the police stopping everybody.' I'm like, 'Cuz, we tripping.' So … I don't even know how they even talked me into it. He like, 'Nigger, come on. Nigger, fuck that shit. Walk with me, nigger. I—I got this—I got you.' He—and he told me like, 'Nigger, if the police come I'm gonna run. Worst come to worst I'm gonna run, you feel me?' They came. Nigger—that nigger didn't even run, Cuz."

In the second call, Turner asked defendant, "Was you holdin' it?" He answered, "No. I tossed it. But they got my fingerprints."

In the third call, defendant told Avery Lewis,[12] his brother-in-law:

"Cuz came over, you know, cats came over, and shit, right? I … told the nigger, I'm like, Cuz, you feel me, I'm gonna get us a ride, just wait. But he on some, uh, urgent ass, 'I'm finna leave, I'm finna leave,' you feel me? I don't wanna let the nigger leave by himself. 'Cause you know what I'm sayin', I'm the only nigger with heat,[13] too. You understand? [¶] … [¶] Only nigger, you understand? So I'm not gonna let this nigger leave by himself. All right. Tell the nigger I'm like, 'Man, let's just wait, Cuz, you feel me?' But then he's tryin' to—he's tryin' to—he's trying to … and leave it, though, you feel me? I'm like, hell, no nigger. What the fuck? So you feel me we leave, we get downstairs I stop him and I tell him, like, 'Hey, we trippin' right now.' So I let the nigger know like that we done been told from five different people, literally, though, five different people that they hide, and they stop, and everything; you feel me? He like, 'Man, fuck it. I'm gonna break, I'm gonna break.' He told me he was gonna run, you feel me? So we walk, and nigger, we get right, right by that big-ass gas station by the train tracks on G Street, you know what I'm talkin' about? [¶] … [¶]

"Nigger, this nigger (Moses) happened to hit the corner; you feel me? [¶] … [¶] This nigger pulled up like, uh, I, I'd already, you feel me? I had

---

**11**     Henderson testified: "All Crip gang members … often use the word 'cuz' as part of their language.… They'll talk about people, call them their cuz."

**12**     Defendant admits in his appellate brief that Lewis, known as "AC," is a "hardcore" Merced Gangster Crip.

**13**     Henderson testified: "[H]eat is a common term to possess a firearm or weaponry of some sort."

already did my shit with, uh, with the bitch;[14] you feel me? [¶] … [¶] I already told the bitch—I'd already told the bitch to get off, nigger. Uh, so I'm thinkin' (Cuz) you feel me? Get on it 'cause he said he was gonna get on and all this shit, you feel me? Nigger didn't even get on. He just sat there. I'm like, 'Fuck, that nigger (Moses) whip out. This nigger (Steve), (Stevie), put your hands up. I'll fuckin' shoot you right now, (Stevie), I'm not playin'. (Stevie) don't make me do it, you feel me?' [H]e was cryin', Cuz. I … really, nigger, really so mad. Like I really let this nigger—I really let this nigger talk me out of my freedom, you know? He just—he just keep tellin' me, 'My fault, my fault, I'm sorry, nigger.' That ain't gonna say nothin'. Every time a nigger go down I always, I always get the worse end of the deal … everything, my nigger .… [¶] … [¶]

"Yeah. Nigger, you know that gas station right there? [¶] … [¶] You know there's a camera right there? [¶] … [¶] It's a big-ass camera overlookin' that whole little area right there, nigger. [¶] … [¶] Yeah, it's— nigger, tell everybody it's a whole… [¶] … [¶] [I]t's a big ass—it's a big ass camera. And it's overlookin' all of that my nigger. [¶] … [¶] And it's a camera on (Gerrard), too. You feel me? [¶] … [¶] Yeah, nigger. There's a camera on (Gerrard), too, my nigger. So let, let everybody know, man. When you niggers is around there. Nigger, I thought I was good. I mean, I got it, I got it all so quick, right? You feel me? I got—I told the bitch to leave so quick that the nigger I was with didn't even know I kicked the bitch out. You feel me? Smooth, though, nigger…. That mother fuckin' nigger had a camera right here, Cuz. That's crazy. Shit, man. You know, I fucked up, my nigger. I—I'm a learn from this."

b.      *Counts 4 through 6*

On January 6, 2012, Sayachak monitored jail calls made by Cornelius Gilchrist, a validated Merced Gangster Crip. During those calls, Gilchrist mentioned someone named "D Nasty" and a gun. Sayachak learned that defendant was known as "D Nasty" and a juvenile parolee. He and Henderson visited defendant's residence to conduct a parole search. Upon arrival, Sayachak saw defendant and Turner standing outside the apartment and called out to him. Turner entered the apartment alone and closed the door. Defendant was notified of the parole search and detained. Sayachak knocked on the

---

**14**      Henderson testified: "[T]hat word 'bitch' is being used … to say firearm."

door, advised Turner of the search, and was allowed in. He found a loaded .357-caliber revolver in a purse inside a closet. In a subsequent interview with Sayachak,[15] defendant admitted that he obtained the gun from "Slim"[16] and placed it in the purse, but maintained that Turner was unaware of it.

Following his arrest, defendant made four jail calls.[17] In a January 10, 2012, call to Turner, defendant related:

> "C Nutty crazy. All right nigga. Four (4) Seven (7), y'all…. [¶] … [¶] That nigga (Dabo) is really a snitch. That's crazy. [¶] … [¶] And he thinks niggas don't know. Them paperwork[18] gonna hit the street …. It's paperwork on a lot of niggas in here, too. [¶] … [¶] It's paperwork on a lot of niggas in here—(Skeet). [¶] … [¶] That's fucked up. (Skeet) gonna put—put that nigga away for a minute, too. [¶] … [¶] (Pistol) is gonna try to come over here in the morning. I'm gonna come right now. Hey, (Pistol) is gonna try to come over here in the morning."

In a January 12, 2012, call, defendant conversed with Turner, Tony Gooden,[19] and an unidentified individual. He told Gooden:

> "[W]hat's up, cuz? [¶] … [¶] Yeah, nigga. Hey, yeah. Man, I'm good but nigga it ain't good though. You feel me? [¶] … [¶] Man, some—somebody like—it's like that real though. Like somebody f…. [¶] … [¶] [L]ike all the way, cuz. On Four (4) Seven (7), cuz."

---

[15]  The jury listened to a recording of this interview.

[16]  The record did not reveal the identity of "Slim."

[17]  The jury listened to a recording of these calls.

[18]  Henderson testified: "'Paperwork' is often used as [a] term for kites …. [T]hey're a means of transporting information both in and out of a jail or a prison. Kites are generally very small strips of paper that have been ripped and then very small, barely legible handwriting is upon those. With these, they're often transported inside and out of prison by individuals usually within their bodies, and they're able then to deliver messages, information, orders, things of that nature both in and out of the jail."

[19]  Defendant admits in his appellate brief that Gooden, who died sometime in 2012 and was known as "Rocko," was a "hardcore" Merced Gangster Crip.

Next, defendant spoke to the unidentified individual:

> "[W]hat it do cuz, west[20] up nigga what's going on?  [¶] … [¶] …
> What's—what's good with you though, cuz?  I just talked to (Pistol).  He
> said he love you cuz and see for all this shit though.  [¶] … [¶]  That's for
> sure, cuz.  On Four (4) Seven (7).  [¶] … [¶]  That's what's up, cuz, on the
> set,[21] nigga.  Out there, nigga.  [¶] … [¶]  That's what's up, cuz.  [¶] … [¶]
> Hey, you move nice 'cause man, somebody singing[22]—I don't know who,
> what, when, where, how, but I know somebody know all that and they
> telling it all, too.  You feel me?  [¶] … [¶] … I love you, too, cuz.  And
> look, y'all stay by Tyriqa.  I'm fixing to send (Stola) a kite right now and
> have that nigga call so we can talk to y'all.…"

Finally, he talked to Turner:

> "[M]y PO came to see me, too, man.  [¶] … [¶]  He was just like—I was
> asking [him] about the parole hold.  He like, 'Man, you can try.'  You know
> what I mean?  But he like, 'Look.'  He told me just like this.  They gotta
> unanimous pick that you and me and you know who was rocking with the
> thing.[23]  You feel me?  He like … [¶] … [¶]  He like, 'So you allegedly
> had this gun.'  [¶] … [¶]  So then he like uh, 'So they got the tip that you
> had this—you and him.'  They're like, 'Then so you allegedly had this
> gun.'  They like, 'Then when they go search they find the exact gun that
> you allegedly had.'  He's like 'I just—I don't think they're—I don't think

---

**20**     Henderson testified:  "Once again, usage of the vernacular that Crips often use when they
speak with one another.  The west side is actually [a] common term that [is] used by several
different types of gang members, but that's basically to say 'I'm on the west side; I'm in the
central valley.'  We've seen that spread across all races, all different types of gangs.  That's [a]
very common gang term."

**21**     Henderson testified:  "What ['on the set'] represents, I had spoken before, as the Crip[s]
being the general umbrella from which all of these different sets come from, they came from and
they take symbols and customs from.  I believe there are 800 sets located right now in the United
States."

**22**     Henderson testified:  "'[S]howing somebody that [defendant] believes that somebody is,
quote, 'singing,' end quote, which in terms means that somebody is out there snitching, that
somebody out there is telling on the other members of this gang, and he's wanting to get that
knowledge out there that this is occurring."

**23**     Henderson testified:  "['Thing'] is in reference to the firearm that [defendant] was located
with."

they're gonna go for it.  I just don't but you can try.'  You know, I'm like, 'Yep.'  [¶] … [¶]  Fucked up, man.  Somebody really singing.  [¶] … [¶]

"I can't believe this shit, man.  Twenty days I'm back in this motherfucker 'cause nigga don't know how to keep their mouth—feel me? [¶] … [¶] They running their mouth like bitches but I learned my lesson.  Um, so I can actually take this time on Four (4) Seven (7) gangster crip.  And when I get out, (Free) gonna be out, too.  You feel me?"

When Turner informed him that someone known as "Old G homie" was "beat up" and "stabbed" by "some Mexicans around here," defendant remarked, "I'm just gonna tell my nigga.  You feel me?  His folks are here right now.  I'm gonna tell my nigga right now, baby.  I'm gonna have tell them…."

In January 23 and 28, 2012, calls to Turner, defendant commented:

"[T]hey got me in the unit over here.  Hella weirdos—my nigga, they fucking turning me and (Pistol) out.  Me and (Pistol) be doing hella weird shit, my nigga.  We be going through it.  [¶] … [¶]  Four (4) Seven (7), baby, Monday through Friday.  Keep calling, right? … [¶] … [¶]  [W]hen you talk to homies, tell them niggas man watch what they say on these phones, 'cause that's—that's another way they caught me.  You know that? [¶] … [¶]  Through these phones.  That's how they caught me.  [¶] … [¶] That and a confidential informant.  That's exactly how they caught me.  [¶] … [¶]  Yeah.  That's how they caught me—confidential informant and because this nigga (Stole) called me on this phone.  [¶] … [¶]  [A] confidential informant and because (Pistol) called me from these phones. [¶] … [¶]  That's exactly how they got me.  [¶] … [¶]  Oh, tell (Freaky Larry) to send me some money on Four (4) Seven (7).  [¶] … [¶]

"They got me and (Pistol) in lock-up, nigga.  Hella weird over here.  They be wiping shit on their window.  Then I'm on Four (4) Seven (7) gangster crip right now.  Hella shit on it all fucked over."

c.  *Gang expert testimony*

At trial, Henderson testified that the Merced Gangster Crips, a subset of the Crips, were founded in the 1980's by Raymond Dean, whose residence at 47 R Street served as headquarters.  The numbers four and seven, often tattooed on members, still retain significance as a symbol of the gang's origin.  The Merced Gangster Crips primarily sell

8.

crack cocaine and commit assaults, burglaries, robberies, and shootings.[24] Their rivals include the Norteños, Bloods, Home Boys Only, and Menace of Destruction, with whom they clash over territory.[25]

Henderson opined that defendant was an active participant in the Merced Gangster Crips for several reasons. First, prior to September 9, 2011, defendant had been arrested on multiple occasions alongside validated members of the gang, including Mays, Gilchrist, Jake Lebeaux, Larry Mays III, and Federick Mays. He had also been convicted of burglary and robbery, crimes in which Merced Gangster Crips routinely engage. Next, on September 9, 2011, defendant brought a gun to protect himself and validated members Mays and High as they "walk[ed] into a well-known gang related area." Henderson specified that a Merced Gangster Crip's gun possession showed rivals his "ab[ility] to use lethal force to protect [the gang], to protect [the gang's] territory and to protect others that are with [the gang]." Furthermore, in jail calls made in September 2011 and January 2012, defendant used common gang terminology, including "4-7," "cuz," "heat," "bitch," "paperwork," "west," "on the set," "singing," and "thing"; identified validated members Gilchrist,[26] Lebeaux,[27] Federick Mays,[28] and Raymond Bankhead[29] by their monikers; disseminated information about possible informants,

---

[24]     The record contains abstracts of judgment for three validated members of the Merced Gangster Crips: Adrian Gabriel Hicks, Cuitlahuac Rivera, and Marcus Bahl Osby. In 2005, Hicks was convicted of assault with force likely to produce great bodily harm and possession of a controlled substance. In 2007, Rivera was convicted of first degree murder, shooting at an occupied vehicle, assault with a deadly weapon, and possession of a firearm. In 2008, Osby was convicted of possession of a controlled substance and possession of a firearm.

[25]     According to Henderson, the section of G Street where Nelson found defendant's gun is a contested area.

[26]     "Pistol," "Stole," and "Stola."

[27]     "C Nutty."

[28]     "Free."

[29]     "Skeet."

9.

surveillance cameras, police wiretapping, and a violent incident involving an ally; and requested compensation from "Freaky Larry" "on Four (4) Seven (7)" for work performed on behalf of the gang. Finally, in May and July 2012, while in custody, defendant was embroiled in physical altercations with members of Home Boys Only and Menace of Destruction.

Henderson stated that defendant did not pretend to be a Merced Gangster Crip. He explained:

> "If you're pretending to be a Crip, or Merced Gangster Crip, to be more specific, you're not going to be able to enjoy the protection and the representation of this gang. If you haven't put in anything … to build this gang to the point of where it is, then you're trying to reap the benefits that that gang does have inside of a jail, out on the streets, inside of a cell, anything of that nature, then will you suffer for that. [¶] … [¶] [T]he disciplinary action can be from a minimal beat down, which is what they call them often, all the way to homicide. It depends on how much they feel they have been disrespected as a gang, even more as a person, as well."

## II. Defense case-in-chief

Defendant testified in his own behalf. He "g[o]t along" and "associate[d] with everybody," including Crips, but was not a member of the Merced Gangster Crips when he was arrested on September 9, 2011, and January 6, 2012. On both occasions, he did not wear blue, the gang's color. In addition, defendant did not flash Merced Gangster Crip signs.

Defendant possessed firearms, even though he could not do so legally, because he lived in an area rife with shootings, robberies, drug activity, and gang violence and needed them for self-defense. In particular, when he accompanied Mays, his brother-in-law, and High, a childhood friend, en route to the nightclub on September 9, 2011, he brought a gun to protect himself and his companions, not "any sort of gang interest."

While defendant was in jail, he called his friends to let them know "what's going on in here" and "who to stay away from," not to disseminate information to a gang. He

10.

admitted that he frequently said "cuz," "4-7," "on the 4-7," and "4-7 Gangster Crip," but maintained that such language had "become a habit" because "[he's] been around it so much" and "mean[t] nothing" to him. Also, people in jail typically communicated in this manner.

<u>**DISCUSSION**</u>

**I.      Standard of review**

"When an appellant challenges the sufficiency of the evidence, the reviewing court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1511; accord, *People v. Bolin* (1998) 18 Cal.4th 297, 331.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis what[so]ever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin*, *supra*, at p. 331.) "For evidence to be 'substantial' it must be of ponderable legal significance, reasonable in nature, credible and of solid value." (*People v. Aispuro*, *supra*, at p. 1511; accord, *People v. Johnson* (1980) 26 Cal.3d 557, 576.) "Although we must ensure the evidence is reasonable, credible, and of solid value, … it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*Ibid.*)

**II.     California Street Terrorism Enforcement and Prevention (STEP) Act (§ 186.20 et seq.)**

Finding that "the State of California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods" and "[such] activities, both

individually and collectively, present a clear and present danger to public order and safety and are not constitutionally protected" (§ 186.21), the Legislature enacted the STEP Act "to seek the eradication of criminal activity by street gangs"(*ibid*.). "In addressing the problem, the STEP Act … created a substantive offense, set forth in section 186.22, subdivision (a), and a sentencing enhancement, set forth in subdivision (b) of the statute." (*People v. Rios* (2013) 222 Cal.App.4th 542, 558.)

a.    *Substantive offense under section 186.22, subdivision (a)*

"Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished …." (§ 186.22, subd. (a); accord, *People v. Albillar* (2010) 51 Cal.4th 47, 54.) "The elements of the gang participation offense[30] in section 186.22[, subdivision ](a) are: First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive;[31] second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity;[32] and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*Rodriguez, supra*, 55 Cal.4th at p. 1130.)

"[T]o satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct." (*Rodriguez, supra*, 55 Cal.4th at p. 1132; see *People v. Albillar*, *supra*, 51 Cal.4th at

---

**30**    The substantive offense has also been called "'street terrorism.'" (*People v. Rios*, *supra*, 222 Cal.App.4th at p. 558.)

**31**    A person who actively participates in a gang may violate section 186.22, subdivision (a), even if he or she is not a member of the gang. (§ 186.22, subd. (i).)

**32**    "[A] 'pattern [of criminal gang activity]' is established by the commission of two or more enumerated offenses committed on separate occasions or by two or more persons." (*People v. Williams* (2009) 170 Cal.App.4th 587, 609; see § 186.22, subd. (e).)

pp. 51, 55, 59 ["any felonious criminal conduct" not limited to felonious gang-related conduct].) Section 186.22, subdivision (a), "requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Rodriguez*, *supra*, at p. 1132.) One may promote, further, or assist in the felonious conduct by at least two gang members by either (1) directly perpetrating the felony with gang members or (2) aiding and abetting gang members in the commission of the felony. (*See id.* at pp. 1135-1136.) Section 186.22, subdivision (a), "reflects the Legislature's carefully structured endeavor to punish active participants for commission of criminal acts done *collectively* with gang members." (*Rodriguez*, *supra*, at p. 1139.)[33]

---

[33] The following examples are illustrative:

Example 1: Gang members X and Y shoot the victim. X contributes to felonious conduct by at least two gang members because he and Y collectively shoot the victim. Likewise, Y contributes to felonious conduct by at least two gang members because he and X collectively shoot the victim. (See *Rodriguez*, *supra*, 55 Cal.4th at pp. 1132, 1135-1136.)

Example 2: Gang members X and Y reveal to Z their plan to shoot the victim. Z is instructed to supply X and Y with firearms and does so. X and Y shoot the victim. Z contributes to felonious conduct by at least two gang members because he aids and abets X and Y in the commission of the shooting. (See *Rodriguez*, *supra*, 55 Cal.4th at pp. 1132, 1135-1136.) Whether Z is a gang member in this scenario is inconsequential.

Example 3: X and Y are gang members. X reveals to Y his plan to shoot the victim. X asks Y to supply the firearm. Y complies. X shoots the victim. X contributes to felonious conduct by at least two gang members because (1) he shoots the victim and (2) he involves Y in the perpetration of the crime. Y contributes to felonious conduct by at least two gang members because (1) he aids and abets X in the commission of the shooting and (2) he is a principal who "commits" the crime alongside X, pursuant to section 31. (See *Rodriguez*, *supra*, 55 Cal.4th at p. 1138.)

Example 4: X, a gang member, reveals to Y his plan to shoot the victim. Y is an active participant of X's gang, but not a member. X asks Y to supply the firearm. Y complies. X shoots the victim. Neither X nor Y violates section 186.22, subdivision (a), because only one gang member engages in felonious conduct. (See *Rodriguez*, *supra*, 55 Cal.4th at p. 1138.) The same outcome results if Y is a member of the gang, but X is not.

**III.** **Substantial evidence did not support defendant's convictions for gang participation on counts 3 and 6**

We find substantial evidence established that defendant was an active participant in the Merced Gangster Crips and knew that its members engaged in a pattern of criminal gang activity.[34] Prior to September 9, 2011, defendant had associated with validated members, including Mays, Gilchrist, Lebeaux, Larry Mays III, and Federick Mays. He had also been arrested alongside these individuals on a number of occasions and convicted of crimes in which the Merced Gangster Crips primarily engage. On September 9, 2011, when defendant accompanied Mays, a validated Merced Gangster Crip, and High, a validated Crip, to the nightclub, he brought a loaded .22-caliber revolver for the purpose of protecting himself and his companions as they walked through contested territory. After his arrest on September 9, 2011, he made a jail call to Lewis, another validated member, in which he spoke in gang language and relayed information about a surveillance camera in the area where he discarded the firearm. Following his second arrest on January 6, 2012, defendant made a series of jail calls in which he repeatedly used gang terminology, in particular "4-7," identified validated members by their monikers, warned about potential snitches and police wiretapping, and requested monetary reparation "on Four (4) Seven (7)." In one of these calls, he conversed with Gooden, an acknowledged, "hardcore" Merced Gangster Crip. Lastly, defendant fought members of rival gangs while he was in custody in May and July 2012.

Nevertheless, we reverse defendant's convictions for gang participation because substantial evidence did not establish that he promoted, furthered, or assisted in the

---

[34] Much of this evidence was taken from Henderson's testimony regarding gang culture and habits, inter alia. Such testimony is permissible in cases where the substantive gang crime is charged or the gang enhancement is alleged. (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512-1513; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196-1199; see *People v. Vang* (2011) 52 Cal.4th 1038, 1044-1049.)

perpetration of felonious conduct by at least two gang members in either instance.[35] With regard to the September 9, 2011, incident, defendant was convicted of two felonies: possession of a firearm (count 1) and possession of ammunition (count 2). In a September 2011 jail call, he told Lewis that he was the only person amongst himself, Mays, and High "with heat" and did not want them to walk to the nightclub without his protection. Defendant, therefore, was already in illegal possession of the loaded .22-caliber revolver when he decided to escort Mays and High. Nothing in the record indicated that he had involved Mays, High, or another gang member in the acquisition of the firearm (see *Rodriguez*, *supra*, 55 Cal.4th at p. 1138) or that either Mays or High exercised dominion or control over the gun (see *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417 [doctrine of constructive possession]). Furthermore, DNA testing verified that neither Mays nor High handled the weapon en route to the nightclub. Thus, while defendant directly perpetrated the aforementioned offenses, the evidence did not adequately demonstrate that he did so in tandem with another gang member. Accordingly, we reverse his conviction on count 3.

The People contend that defendant contributed to felonious conduct by at least two gang members because he was "encouraged" to carry his firearm by Mays and High. In other words, Mays and High "aided and abetted" "[defendant]'s unlawful possession of a firearm and ammunition." The proper inquiry, though, is whether a *defendant* aided and abetted gang members in the commission of felonious conduct, not vice versa. (*See Rodriguez, supra*, 55 Cal. 4th at pp. 1135-1136.) Here, the record showed that Mays was in a hurry to go to the nightclub and refused to wait for a ride. Defendant recognized that Mays and High would be unarmed and therefore vulnerable. Despite his own misgivings about police stops in the area, defendant decided to accompany the pair due to Mays's

---

[35] For the purpose of our analysis, we assume arguendo that defendant is a member of the Merced Gangster Crips.

assurances that he "'got this'" and would "'run'" or "'break.'" From the time the three men left for the nightclub to the moment they were arrested, however, there was no evidence that Mays or High attempted, let alone committed, a separate felony. In the absence of this predicate crime, defendant could not be found criminally liable as an aider and abettor. (See *People v. Perez* (2005) 35 Cal.4th 1219, 1225, citing § 31.)

The People also emphasize that defendant's gun possession prepared him, Mays, and High to use lethal force *if* they encountered rivals. This is similar to the proposition that a defendant's commission of a felony "emboldens fellow gang members to commit other, unspecified crimes in the future and, thus, 'advances the gang's overall felonious purpose.'" (*Rodriguez*, *supra*, 55 Cal.4th at p. 1137, quoting *id.* at p. 1143 (dis. opn. of Kennard, J.).) Section 186.22, subdivision (a), "requir[es] the promotion or furtherance of *specific conduct* of gang members and not inchoate future conduct." (*Rodriguez*, *supra*, at p. 1137, citing *People v. Castenada* (2000) 23 Cal.4th 743, 749.) Finally, the People remark that defendant's gun possession "benefitted" Mays and High. This factor is immaterial where the gang participation offense is charged.[36] (See *Rodriguez*, *supra*, at pp. 1137-1138.)

With regard to the January 6, 2012, incident, defendant was again convicted of felony possession of a firearm (count 4) and felony possession of ammunition (count 5). At the time of his arrest, only Turner, who is not a validated gang member, was present. The record did not indicate that defendant procured the loaded .357-caliber revolver with the assistance of a gang member, that he aided and abetted a gang member in the commission of a different felony, or that another gang member exercised dominion or control over the firearm. The People also concede that the evidence did not sufficiently

[36]    On the other hand, the STEP Act's sentence enhancement applies to "any person who is convicted of a felony committed *for the benefit of …* any criminal street gang." (§ 186.22, subd. (b)(1), italics added; see *Rodriguez*, *supra*, 55 Cal.4th at pp. 1138-1139.)

16.

establish that defendant acted in concert with another gang member.  Accordingly, we reverse defendant's conviction on count 6.

## DISPOSITION

The judgment of conviction on counts 3 and 6 is reversed and the matter is remanded for resentencing.  The judgment is affirmed in all other respects.

_____

Kane, J.

WE CONCUR:


_____

Hill, P.J.


_____

Levy, J.