Filed 3/10/15  P. v. Boyd CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DARIUS LONNELLE LERENZO BOYD,<br><br>Defendant and Appellant. | F067311<br><br>(Super. Ct. No. 12CM4129)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Thomas DeSantos, Judge.

Thomas M. Singman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Darius Lonnelle Lerenzo Boyd was charged with robbery (Pen. Code,[1] § 211; counts 1 & 3), assault by means of force likely to produce great bodily harm (§ 245, subd. (a)(4); count 2), and active participation in a criminal street gang (§ 186.22, subd. (a); count 4). The information also alleged that he committed the crimes underlying counts 1 through 3 for the benefit of, at the direction of, or in association with a gang (§ 186.22, subd. (b)). The jury convicted defendant as charged on counts 1 and 4, found him guilty of the lesser included offenses of simple assault (§ 240) and grand theft (§ 487, subd. (c)) on counts 2 and 3, respectively, and found true the special allegation. The court sentenced him to 15 years four months in state prison.[2]

On appeal, defendant makes two contentions. First, as to count 4, the evidence did not establish that at least two gang members contributed to felonious criminal conduct. Second, as to counts 1 through 3, the evidence did not support the special allegation. In affirming the judgment, we find substantial evidence showing that (1) at least two gang members were involved in a felony; and (2) defendant committed the offenses underlying counts 1 through 3 in association with a criminal street gang.

## STATEMENT OF FACTS

### I.   Prosecution case-in-chief.

a. *Leanne Laughlin.*

On the evening of June 18, 2012, Laughlin purchased a matchbook at Quick Shop Market (Quick Shop), located on the corner of Phillips Street and Scott Street in Hanford, California. As she was leaving the store, one of three African-American men who were standing outside called out, "Hey, little mama." Laughlin greeted him, but continued to

---

[1]    Subsequent statutory citations refer to the Penal Code.

[2]    Specifically, the court imposed (1) a principal term of three years, plus a 10-year gang enhancement (§ 186.22, subd. (b)(1)(C)), on count 1; (2) a subordinate term of eight months (see *id.*, subd. (d); § 1170.1, subd. (a)) on count 2; and (3) a subordinate term of eight months, plus a one-year gang enhancement (see §§ 186.22, subd. (b)(1)(A), 1170.1, subd. (a)), on count 3. Execution of punishment on count 4 was stayed (see § 654).

walk away. The trio followed her on Phillips Street. One commented, "I want to take you down." Laughlin responded, "I don't really know what you mean by that, but if you mean what I think you mean, you're just a couple years older than my daughter." The men asked her about the amount of money in her purse and for the personal identification number of her "EBT" card. When they reached the end of the street, a fourth African-American male appeared, pointed a gun at Laughlin's head, and took her purse. The armed man walked toward Quick Shop as he rummaged through the purse. Meanwhile, the other three men were "laughing and chuckling." Laughlin surmised:

> "[T]hey were friends with the guy who had my purse …. [¶] … [¶] … [T]heir reaction to when he came up, you know, they didn't react to it as if they didn't know who he was or where he came from. [¶] … [¶] … They didn't do anything."

Laughlin confronted the armed man outside Quick Shop and asserted, "I don't give a fuck if I don't have no fucking money. This is my fucking purse and I want my fucking purse back." The armed man punched her in the head. Laughlin "fell back," but then "started hitting him." She was struck repeatedly by both the armed man and one of the three men who initially followed her. Laughlin sustained bruises on her face and arm. After the assault ended, she entered and remained inside the store until the police arrived. Surveillance cameras recorded the altercation.[3]

   b. *Julian Cruz.*

On or about June 19, 2012, at approximately 3:00 p.m., Cruz, a snow cone vendor, was walking on Third Street in Hanford when two African-American men restrained his arms and neck. Two other African-American men took $20 or $30 out of his pockets. The four fled the scene on foot.

---

[3] The jury watched this footage.

c. *Adam Yingling.*

On or about June 25, 2012, Yingling and Rachel Azevedo, a photojournalist and news reporter, respectively, visited Quick Shop, where they attempted to interview individuals about the recent string of robberies in the area. At trial, Yingling testified:

> "When we got to the store it was relatively quiet…. I think there was a couple of people wandering outside of the store when we got there. [¶] … [¶] … [B]y the time we went in to talk with the clerk, a lot of people started showing up and making noise, and then by the time we left there was maybe about a dozen-ish people around the store congregating. [¶] … [¶]
>
> "… They were all African-American mostly. There was a couple of Hispanics off to the side. [¶] … [¶] … There was several youthful people I would say maybe under 20, more than 13, you know, age-wise. They, a group of about 9, maybe 12 people were congregating around us asking me questions, saying like, 'Hey, camera man, are you recording?' [¶] … [¶]
>
> "… We walked across the street sort of catty-corner to the store and where our van was parked and I put the camera on a tripod then. [¶] … [¶] … They followed us out of the store. Some were out of the store, some were in the store. Most of them followed us outside of the store and kind of stood in the middle of the street. A couple of them came over to me and tried to talk to me."

The interlopers made several remarks:

> "How long you all gonna be out here? [¶] … [¶] … We don't know but moving dope in we crippen out here. [¶] … [¶] … No people robbed, people. [¶] … [¶] … You all recording? [¶] … [¶] … Why you out here then? [¶] … [¶] … Ain't nothing worth recording why you all out here then? Get up out of here you all (inaudible). [¶] … We crips out here man (inaudible). [¶] … [¶] … What's going on news camera man. [¶] … [¶] … Hey you wanna know the real real story…. Let me see…. Uh let me see the mic so (inaudible)…. [¶] … [¶] … Tell her to come over here. She's always giving a fake story…. [¶] … [¶] … Keep recording and I'm gonna show you what this mag do. [¶] … Hey whenever you all ready to record something call us. [¶] … We go harder than Fresno. [¶] Man yeah we go hard out here in the little town of Hanford man we crips. [¶] … Little dusty town we going. We going ain't nothing but, ain't nothing out here, I'm saying. Our niggers got five six malls in Fresno."

4.

Yingling "hot-roll[ed]"**4** the encounter as a precaution.**5**

    d. *Detective Cory Mathews.*

Mathews interviewed defendant on June 26, 2012.**6** When Mathews asked defendant about his whereabouts on June 18, 2012, defendant replied that he was "probably by [Quick Shop]" or "down the street." He denied seeing anything unusual or being with his brother, Marcus Porter. Mathews reminded defendant that the store's surveillance cameras recorded Laughlin's assault. Defendant backtracked:

> "I don't know, I don't know if she was drunk and she got in my face yelling. [¶] … [¶] … [S]he walking down the street yelling. I have an air s[oft] gun[7] on me. [¶] … [¶] … I threw it somewhere[.] [¶] … [¶] … She got in my face and I don't like the people get in my face, that makes me mad. [¶] … [¶] … I was just talking to her. [¶] … [¶] … My brother was talking to her. [¶] … [¶] … And they walked down the street somehow she came back to me yelling and then I got mad. [¶] … [¶] … So I hit her.… [¶] … [¶]

> "… Me and my brother walk down the street with a girl …. [¶] … [¶] … I told her shut up bitch, then we argued. Then I said stuff and shit to her then I walk down the street. That's all[.] [¶] … [¶] … I threw her purse on the ground. [¶] … [¶] … I didn't have [the air soft gun] somebody else had it. And then, then somebody else had it and I took it from them[.] [¶] … [¶]

> "… [W]e got back down the street. I know you all seen on the camera …. [¶] … [¶] … [W]ent down the street I didn't want to hold [the air soft gun] no more so I said here man take this. [¶] … [¶] … Somebody that was next to me. I just handed it off to him …. [¶] … [¶] … And then the girl came to me talking just talking and yelling and shit …. [¶] … [¶]

---

**4**     Yingling testified that "hot-rolling" means "basically turn[ing] the [video] camera on record mode and leav[ing] it rolling for a duration of time."

**5**     The jury watched this footage.

**6**     The jury watched a video recording of this interview.

**7**     Mathews testified that an air soft gun is "a plastic toy replica that shoots small plastic pellets," is "relatively the same exact size and shape of real guns," and "look[s] fairly real."

… [S]o I got mad. I hit her, she didn't hit her cause she was a female but I was mad."

Defendant denied planning to rob Laughlin. He later clarified:

"Somebody else was talking about robbing somebody …. [¶] … [¶] … I heard somebody say let's rob somebody. [¶] … [¶] … [W]e go down to the store and chill until I seen the girl I tried to get with her[.] [¶] … [¶] … [T]hey rob or somebody robbed her and then shit I had the purse I threw the purse on the ground. [¶] … [¶] … They robbed man. Yeah they robbed. I had her purse. [¶] … [¶]

"… [I was with] Little C. [¶] … [¶] … Little C is a Mexican dude. [¶] … [¶] … And they went down there Little C robbed her. [¶] … [¶] … [Little C had] [m]y gun yeah. Then I got, I took it, he gave it to me down the street. [¶] … [¶]

"… I walked down with it in front of the camera then I didn't want to hold it no more so I said here have it take this. The lady was yelling somebody robbed everybody had black on. I had black but she just came to me you know so shit I got mad and I come on I ain't even the one that did it to you. I would tell her if I the one that did it to her. She just kept on and kept on and kept on and kept on. I got mad."

Next, Mathews inquired about the theft of an "ice cream man." Defendant admitted witnessing the incident, but denied stealing any money or knowing the identities of the culprits:

"Dude with the ice cream whatever he is. [¶] … [¶] … I was there they robbed him I ran with them. [¶] … [¶] … I don't know was like say three maybe four people. [¶] … [¶] … And I was with them when they robbed him. [¶] … [¶] … I think twenty-four dollars. [¶] … [¶] … I ran with them cause if I was there (inaudible) the police see me walk they're gonna stop me cause I was there with em. [¶] … [¶] … So I ran too …."

Finally, Mathews asked defendant if he told Azevedo and Yingling that he wanted to "put Hanford on the map" in order to "build[] [his] gang up …." Defendant replied:

"I built nothing up just wanted to be on the news. [¶] … [¶] … To let everybody know that Hanford that small there's people out there too. [¶] … [¶] … I just wanted to be on the news. The news lady came out …. [¶] … [¶] … and says, asked me if I was a student or something. [¶] … [¶] … I told her no and then the dude record it (inaudible) oh we putting Hanford on the map. That's it. They came out there and recorded us so I

6.

just said oh Hanford on the map.  [¶] … [¶]  … It don't mean nothing, I just say it."

Defendant denied being a Crip, but conceded knowing members of the Eight Tray Gangsters (ETG) and Hanford Gangster Crips (HGC) and "kick[ing] it with em."

    e.  *Rayshun Dean.*

At trial, Dean testified that he "lived on the south" and frequented Quick Shop because "that was the only store right there that I can go to."  He would go with "everybody," including defendant and Dion Loftis-Williams.  On June 18, 2012, Dean was in front of the store when "a lady was hurt," but denied seeing what transpired.  He explained that his subsequent statements to the police were based on hearsay.

Dean recounted the time he loaned his bicycle to defendant:

> "I was chilling outside by the doll house and we just, we was talking about something, I don't remember, and he was like, 'Can I use your bike?'  I gave him my bike, you know, and he left."

Defendant did not tell Dean "what he was using [the] bike for" or "if he was going to get any money."  After defendant returned, he gave Dean some money.

The prosecutor inquired about the meaning of the phrase "put Hanford on the map."  Dean responded:

> "Everybody was saying it, but, you know, it just didn't come from one person, everybody was saying it ….  [¶] … [¶]  … I said it, ma'am. [¶] … [¶]  … It's not a good thing.  It could be taken as a good way and it could be taken as a bad way.  I really have no meaning to 'putting Hanford on the map[,'] but if my meaning was 'putting Hanford on the map' it would be doing something good because I've been in trouble before, you know, and I just want to do something positive."

When questioned whether he was affiliated with Crips, Dean answered:

> "Well, now that [the police] have me is, I am, ma'am.  [¶] … [¶]  … I got put on the gang contract, you know, so I have to be, you know, because they put me on it, you know.  It's not like I was, I was -- it was like I was forced to be on it because they put me on it."

Dean added that he regularly came across Crips because "[he] stay[ed] on the south."  He denied having a nickname.

7.

On cross-examination, Dean acknowledged that he had been arrested for felony assault, pled guilty, and received five years' probation. At the time he was interviewed by the police, his case was still pending.

In a June 27, 2012, interview with Mathews, Dean related that "he saw [defendant] strike [Laughlin] several times in the face." He also "saw … Porter … strike [Laughlin] several times." On another occasion, defendant, Dean, and Keith Moore were leaving the "doll house," a residence on Hanford Armona Road, when defendant asked to borrow Dean's bicycle to "'do a lick' or rob somebody." Defendant rode the bicycle northbound on Phillips Street and stole cash from a street vendor. He met Dean and Moore at "the hill" near Redington Street and Davis Street and gave each of them $20. Dean acknowledged that "some people call him G Smooth."

f.  *Dion Loftis-Williams.*

At trial, Loftis-Williams testified that he, defendant, Porter, Dean, and Chris Cordero, inter alios, were at Quick Shop on the evening of June 18, 2012. Approximately one foot away from Loftis-Williams, defendant pointed a "little toy gun" at Laughlin, took her purse, walked off, and then "threw it on the floor because there was nothing in there." In front of the store, Laughlin "went into [defendant] and tried to get the bag back and swung on him." Defendant struck the woman in the head about four times. Loftis-Williams did not know whether defendant associated with any Crips and denied being a member of and associating with members of HGC. He later acquiesced that Montreal Kelly, a relative, was a member of that subset.

On cross-examination, Loftis-Williams acknowledged that he had been arrested for felony assault in connection with the instant case, pled guilty, and received felony probation with a strike.

In a June 28, 2012, interview with Officer James Edlund, Loftis-Williams admitted "associat[ing] with … Crips because of family members," namely Kelly and Shaquiel "Little Shack" Helm. He also indicated that defendant was a member of ETG.

g. *Officer Justin Vallin.*

Vallin, a gang expert who has "investigated numerous crimes involving Crip gang members" and "contact[ed] Crip gang members who informed [him] of their specific [modus operandi] on the street," testified that 250 to 300 Crips reside in Kings County. Fifty to 75 of them live in Hanford. The various subsets, including ETG, HGC, Triple Tray Gangsters (TTG), and Lemoore Gangster Crips (LGC), "currently all get along with each other." Crips identify with the number three[8] and the color blue, although some are less likely to "'fly[] their colors'" nowadays:

> "Gang members …, [from] what we've seen over the last five years[,] … won't be … 'flying their colors.' It depends on which specific gang they're with. [¶] If they claim the color blue, … they won't be flying those colors as predominantly [as] in the years past, and the reason we've found is they don't want to … attract law enforcement's attention.
>
> "They don't want to be labeled as a gang member because when we contact these individuals we fill out what's called a Field Interview Card and we document our contact with them, such as their name, date of birth, time and place where we stopped them, the type of clothing they're wearing, what they tell us, any type of tattoos; their self-admissions, who they're with, and what they've realized is this will come back and get them if they ever get arrested for a gang-related crime.
>
> "So they will wear a small amount of their specific color that they claim on their person to identify themselves to other gang members in their gang, but to also tell other rival gang members who they are and what they represent."

Crips primarily engage in homicides, robberies, burglaries, assaults, vandalism, and drug sales.[9] They are "motivated by money and power" and seek to instill "fear and intimidation within the regular citizens on the street." Crips "travel in packs" "because

---

[8]     Vallin explained that the number three corresponds with the third letter of the alphabet, C, which, in turn, stands for "Crip."

[9]     Vallin confirmed that validated Crips have been convicted of offenses such as robbery, assault with a deadly weapon, kidnapping, and possession of a concealed firearm.

9.

it's threat by numbers." They are "very territorial" and "like to claim … certain neighborhoods in certain cities." For instance, the area surrounding Phillips Street and Scott Street in Hanford, where Quick Shop is located, is "predominantly a Crip neighborhood." Vallin noted that this area has been visibly "tagged" with the word "moovin," a Crip term signifying that "Crips are moving … into the neighborhood."

Vallin reviewed Yingling's footage and highlighted the interlopers' "desire for … power … [and] territory":

> "[In] the specific case of where the news camera people were down there at Scott and Phillips Street, not only were [the interlopers] trying to get themselves on the news to show who they are, what they represent, you heard people saying Crip, Crip gang slurs[10] while the camera was rolling, you saw them dancing.
>
> "Again, traveling in a pack like a pack of wolves, numerous people standing around, congregating in the middle of the street, cars having to drive by them, they're showing their power that they own that area, that they're not afraid, and they're not going to get out of the way for a vehicle. The vehicle has to get out of the way of them. [¶] … [¶]
>
> "… I see two of the individuals in [a] particular shot right there where there's four of them, two of them are wearing blue clothing … which is commonly worn by Crip gang members. [¶] … [¶]
>
> "… Cars that are having to drive around, having to drive around them, drive slowly through the area…. [T]he large crowd of about [eight] … that are several feet into the street, cars are having to drive around them. They're being loud, belligerent, asserting their territory and claiming their territory."

The interlopers included (1) defendant, who wore a white shirt, tan shorts, and a cap with a blue back strap; (2) Porter, who wore a blue shirt; (3) Cordero, who wore a white shirt and black shorts; and (4) Helm, who wore a black shirt.

Vallin listed the various criteria used for identifying gang members, such as self-admission, having a moniker, having gang-related tattoos, wearing gang colors,

---

**10** Vallin testified that he heard someone yell "moovin."

associating with other gang members, and frequenting gang neighborhoods. He attested that Helm was a registered Crip. Past police contacts showed that Helm wore blue apparel, associated with known Crips, and performed the "Crip walk."[11] Moreover, his lack of blue attire in Yingling's footage was consistent with the gang's recent shift away from "flying [its] colors" excessively.

Vallin opined that both Dean and Loftis-Williams were Crips. Dean had the moniker "G Smooth" and "served some type of purpose [during Laughlin's robbery and assault], either being a look-out, being part of the robbery, taking the wallet, [or] being part of hitting [her]." Loftis-Williams admitted associating with Crips. Vallin also commented on Dean's and Loftis-Williams' inconsistent remarks and poor memory at trial:

> "Gang members don't want to be classified as snitches…. [S]nitches will get harmed on the street. Not harmed by their own gang but harmed by any type of gang, even rival gang members. Once they are labeled a snitch they're marked for life.
>
> "In this particular case and in other cases gang members who are forced to come into court, have to per a subpoena, they don't want to come in on their own accord to testify whatsoever. Some of them will lie. That way their names can't be put on any type of documents what they call … 'put on paper' because that type of paper makes its way through the jail system or the correctional institute. That way everybody in the jail system as well as on the street knows that they're a snitch and that they're no good. [¶] … [¶]
>
> "… They can get harmed. [¶] … [¶] … Everything from getting murdered to felonious assaults, stabbed, shot, their house is fire-bombed. Several different types of violent crimes can happen to them. [¶] … [¶]
>
> "… A lot of times the easy way out for them is to say they don't recall or they don't remember. [¶] … [¶] … Specifically in Mr. Dean's

---

**11** Vallin testified that the "Crip walk" is "a specific dance, and the way that a Crip gang member moves [his] feet and moves around in a specific area it spells out the word Crip on the ground."

11.

case, he had … a lot of memory lapse, as well as in Mr. Loftis[-Williams's] testimony in some areas he was forgetful as well, that he did not recall."

Vallin opined that defendant was a Crip. In past contacts with the police, he exhibited an ETG-related tattoo. Others suspects in the instant case divulged to the police that defendant had the moniker "Moovin." Furthermore, when he was booked into jail following his arrest for Laughlin's robbery and assault and Cruz's theft, he requested to be classified as an Eight Tray Gangster Crip even though he could have chosen general population pods without any affiliations.

Regarding Laughlin's robbery and assault, Vallin concluded that Crips perpetrated as well as benefited from these crimes:

> "In this particular case, … Miss Laughlin walked into a known Crip neighborhood. She went into a store that's mostly frequented by Crip gang members. [¶] She was followed by several people … [like] a pack of wolves following [their] prey. Her purse was stolen from her, a gun pointed at her, either a fake or a real gun. Her purse was taken.
>
> "She got very upset. She confronted the person that took this purse. That was a huge disrespect just her confronting that individual, and disrespect in the gang culture is tremendous. [¶] He would have been viewed upon as being weak, being frail if he didn't act upon her and … 'put her in her place.' He began to beat her. And then they all shared the rewards out of that. [¶] A couple people ended up beating her…. Even though she said she didn't have any type of money, they didn't know that at that specific time, but they were all going to benefit from that."

Regarding Cruz's theft, Vallin concluded that Crips perpetrated as well as benefited from this crime:

> "Four individuals are singling out one innocent bystander. That person is going to be very intimidated and will probably submit to anything that those individuals want them to do and in this case take his money. [¶] … [¶] … [The theft] not only benefits the street gang, but it is in association with the street gang by the amount of people that were involved with it.
>
> "It benefits the specific gang because the specific gang members benefited from the money that they stole from him. [¶] They used that money for anything that they want to; be it narcotics or food or whatever they wanted at that specific time. [¶] … [¶]

12.

"… [Defendant] was sharing the proceeds with … Dean…. Dean … had let him borrow his bicycle to go commit this robbery. So he was an active participant to allow him the mode to get from point A to point B to do the robbery, and because of that he shared some of those proceeds with … Dean."

## II.    Defense case-in-chief.

Genise Garcia testified that she and defendant, her son, lived on Redington Street near Quick Shop. She was "blown away" by his arrest because "[he] doesn't get in trouble." Garcia was also Porter's mother. She maintained that neither defendant nor Porter was a gang member. Garcia did not observe any signs of gang affiliation.

## DISCUSSION

## I.    Standard of review.

To resolve the question of whether the evidence was sufficient to support a criminal conviction or sentence enhancement, we review the entire record in the light most favorable to the prosecution to determine whether it contains substantial evidence—i.e., evidence that is reasonable, credible, and of solid value—from which any rational trier of fact could find that the elements of the crime or enhancement were established beyond a reasonable doubt. (See *People v. Gonzalez* (2012) 54 Cal.4th 643, 653; *People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*Albillar*, *supra*, at p. 60.)

"Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis what[so]ever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, *supra*, 51 Cal.4th at p. 60.)

13.

"Although we must ensure the evidence is reasonable, credible, and of solid value, … it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*Ibid.*)

## II.  Analysis.

### a.  *As to count 4, substantial evidence established that at least two gang members contributed to felonious criminal conduct.*

"Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished …." (§ 186.22, subd. (a); accord, *Albillar*, *supra*, 51 Cal.4th at p. 54.) "The elements of the gang participation offense in section 186.22[, subdivision ](a) are:  First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (*Rodriguez*).)

"[T]o satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct.  The plain meaning of section 186.22[, subdivision ](a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1132; accord, *People v. Johnson* (2014) 229 Cal.App.4th 910, 920 (*Johnson*).)  One may promote, further, or assist in the felonious conduct by at least two gang members by either (1) directly perpetrating the felony with gang members or (2) aiding and abetting gang members in the commission of the felony. (*Johnson*, *supra*, at pp. 920-921, citing *Rodriguez*, *supra*, at pp. 1135-1136;

14.

see *Rodriguez*, *supra*, at p. 1139 ["[S]ection 186.22[, subdivision ](a) reflects the Legislature's carefully structured endeavor to punish active participants for commission of criminal acts done *collectively* with gang members."].)

On appeal, defendant does not challenge his convictions on counts 1 through 3. He also concedes that Porter, his brother, participated in Laughlin's robbery and assault. Defendant only contends that he did not act in concert with gang members. However, we find substantial evidence showing that both defendant and Porter were Crips. (See *Rodriguez*, *supra*, 55 Cal.4th at p. 1132; *Johnson*, *supra*, 229 Cal.App.4th at p. 920 [a defendant may constitute one of the two gang members required by § 186.22, subd. (a), if he himself is a gang member].) Vallin, the gang expert, identified various indicia of Crip membership, including self-admission, having a moniker, having gang-related tattoos, wearing the color blue, associating with other Crips, and frequenting Crip territory.[12] The record—viewed in the light most favorable to the verdict—demonstrates that defendant (1) specifically asked to be housed in a Crip jail pod following his arrest; (2) had the moniker "Moovin," which doubles as a Crip slogan; (3) had a gang tattoo related to ETG, a Crip subset; and (4) admitted to Mathews that he "kick[ed] it" with ETG and HGC members. Loftis-Williams separately confirmed that defendant was an ETG member. In addition, Yingling's footage, which was recorded in Crip territory, showed defendant and Porter (1) "flying [Crips'] colors" by wearing a cap with a blue back strap and a blue shirt, respectively; (2) associating with Helm, a validated Crip gang member; and (3) associating with other individuals who wore blue, obstructed traffic, hassled and intimidated Azevedo and Yingling, and/or made gang-related remarks such as "[W]e crippen out here," "We crips out here man," and "[W]e go hard out here in the little town

---

[12]    "Gang evidence, including expert testimony, is relevant and admissible to prove the elements of the substantive gang crime and gang enhancements" (*People v. Williams* (2009) 170 Cal.App.4th 587, 609), including "a defendant's membership in a gang" (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1120).

of Hanford man we crips." Based on this evidence, any rational trier of fact could have found beyond a reasonable doubt that defendant and Porter were Crip gang members.

        b.      *As to counts 1 through 3, substantial evidence supported the special allegation.*

Subdivisions (b) and (d) of section 186.22 apply to any person who is convicted of an offense "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members …." "Thus, the trial court can impose the enhancement[13] only if the prosecution establishes both of the following elements beyond a reasonable doubt: first, that the defendant committed a felony (a) for the benefit of, (b) at the direction of, or (c) in association with a criminal street gang; and second, that in connection with the felony, the defendant harbored the *specific intent* to (a) promote, (b) further, or (c) assist in any criminal conduct by gang members." (*In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1358.)

As to counts 1 and 2, defendant and Porter indisputably robbed and assaulted Laughlin in Crip territory. The fact that defendant, a Crip, committed two of the gang's principal criminal activities with Porter, another Crip, not only satisfied the first element's "in association with a criminal street gang" language (see *Albillar*, *supra*, 51 Cal.4th at p. 62; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*)), but also constituted "substantial evidence … support[ing] the inference that the defendant acted with the specific intent to promote, further or assist gang members in [any criminal conduct]" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322; accord, *Albillar*, *supra*, 51 Cal.4th at p. 68; *People v. Miranda* (2011) 192 Cal.App.4th 398, 411-412; *Morales*, *supra*, at p. 1198; see *People v.*

---

**13**    We recognize that subdivision (d) of section 186.22—the basis for defendant's sentence on count 2—is an alternate penalty provision rather than a sentence enhancement. (See *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 898-900.) For our analysis, however, we treat subdivisions (b) and (d) identically.

16.

*Manibusan* (2013) 58 Cal.4th 40, 87 ["'[E]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence ....'"]; *People v. Margarejo* (2008) 162 Cal.App.4th 102, 110 ["We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say."]).

As to count 3, the record shows that defendant told Dean about "'do[ing] a lick' or rob[bing] somebody," borrowed Dean's bicycle, rode northbound on Phillips Street, and stole cash from Cruz on Third Street with three unidentified accomplices. Thereafter, he met with Dean at a "hill" near Redington Street and Davis Street—a short distance from Quick Shop— and gave him $20. In an interview with Mathews, Dean admitted this account, being called "G Smooth," and seeing defendant and Porter assault Laughlin. At trial, though, Dean denied witnessing Laughlin's assault, knowing about defendant's plan to steal from Cruz, having any nickname, or being a Crip. Vallin attributed Dean's reticence to a fear of being classified as a snitch and "'put on paper.'"[14] In our view, a rational fact finder could have concluded that Dean was a Crip because he (1) associated with defendant; (2) frequented Crip territory; (3) had the moniker "G Smooth"; and (4) testified in such a manner as to avoid implicating the gang. In turn, the fact that defendant involved Dean in the perpetration of Cruz's theft—i.e., by asking Dean to supply the mode of transportation—established both the "in association with a criminal street gang" element (see *Albillar*, *supra*, 51 Cal.4th at p. 62; *People v. Martinez*, *supra*, 158 Cal.App.4th at p. 1332; *Morales*, *supra*, 112 Cal.App.4th at p. 1198), and the specific intent to promote, further, or assist in any criminal conduct by gang members (see

---

**14**    "Gang sociology and psychology are proper subjects of expert testimony [citation] as is 'the *expectations* of gang members … when confronted with a specific action' [citations]. Expert testimony is admissible to establish the existence, composition, culture, habits, and activities of street gangs; a defendant's membership in a gang; gang rivalries; the 'motivation for a particular crime, generally retaliation or intimidation'; and 'whether and how a crime was committed to benefit or promote a gang.' [Citation.]" (*People v. Hill*, *supra*, 191 Cal.App.4th at p. 1120.)

*Albillar*, *supra*, 51 Cal.4th at p. 68; *People v. Miranda*, *supra*, 192 Cal.App.4th at pp. 411-412; *People v. Villalobos*, *supra*, 145 Cal.App.4th at p. 322; *Morales*, *supra*, at p. 1198.)

## **DISPOSITION**

The judgment is affirmed.

_____

DETJEN, J.

WE CONCUR

_____

POOCHIGIAN, Acting P.J.

_____

PEÑA, J.