Filed 12/7/15  P. v. Luker CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL LUKER,<br><br>    Defendant and Appellant. | G050566<br><br>(Super. Ct. No. 12CF1048)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed on November 10, 2015, be modified in the following particulars:

On page 2, first full paragraph is deleted and replaced with the following:

"Daniel Luker appeals from a judgment after a jury convicted him of misdemeanor simple assault, conspiracy to commit assault with force likely to produce great bodily injury, and street terrorism, and found true street terrorism enhancements. Luker argues the trial court erred by admitting evidence and insufficient evidence supports his convictions and the enhancements.  None of his contentions have merit, and we affirm the judgment."

On page 4, second full paragraph, in the second sentence delete the word "Edelmon" and replace with "Edelman."

On page 4, second full paragraph, in the third sentence delete the word "Edelmon" and replace with "Edelman."

On page 5, first full paragraph, the following sentence shall be added after the first full sentence:

"With respect to count 2, the information alleged the following five overt acts: (1) Stringfellow called Prescott and asked her to place a three-way call to Luker, which she did; (2) Stringfellow left a message for Luker telling him that Miranda had a message for Luker and he asked Luker to do something for him; (3) Stringfellow called Prescott and asked her to place a three-way call to Miranda, which she did; (4) Stringfellow asked Miranda if Luker had visited her and she said Luker would "'wallop'" the person in question; and (5) Stringfellow called Prescott, who said Luker had done what he had asked."

On page 7, first full paragraph, in the second to last sentence delete the word "Edelmon" and replace with "Edelman."

On page 8, first full paragraph is deleted and replaced with the following:

"Based on a hypothetical question matching the facts of the case, Monteleone testified the offense was done for the benefit of, in association with, and at the direction of a criminal street gang, "gang B," because it demonstrated the gang's "ability to organize and carry out the assault." He added gang B's and the gang member's reputation were enhanced because it established the gang could carry out the violent assault, thereby earning gang A's respect. He also stated the offense was done with the intent to promote, further, or assist criminal conduct because gang B carried out a violent assault and enhanced its reputation in the community because victims and witnesses would be reluctant to testify allowing gang B to commit future crimes. He also said the offense showed the gang member is an active participant of the gang because he had the ability to orchestrate the assault on behalf of the gang."

On page 8, third full paragraph, in the first sentence insert the word "misdemeanor" before the word "simple."

2

On page 9, first full paragraph, the following sentence shall be added to the end of the parapgraph:

"The court imposed a concurrent term of four years on count 3 and suspended sentence on count 1."

On page 13, first full paragraph, in the sixth sentence delete the word "Edelmon" and replace with "Edelman."

On page 16, section C is deleted and replaced with the following:

"*C. Street Terrorism Enhancement*

Luker argues insufficient evidence supports the jury's findings he committed counts 1 and 2 for the benefit of a criminal street gang. Again, we disagree.

"[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished [with an additional term] . . . ." (§ 186.22, subd. (b)(1).)

In *Albillar, supra,* 51 Cal.4th at page 60, the California Supreme Court explained that although not every crime committed by gang members is related to a gang for purposes of the first prong, a crime can satisfy the first prong when it is gang related, meaning it was done for the benefit of, at the direction of, or in association with a gang. The *Albillar* court also explained the second prong, which requires the defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1)), need not encompass proof the defendant committed the crime with the specific intent to promote, further, or assist *other* criminal conduct by gang members. Instead, that subdivision "is unambiguous and applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced."

3

(*Albillar, supra,* 51 Cal.4th at p. 66.) The court concluded, "the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*Id.* at p. 67.)

The *Albillar* court stated a gang expert's opinion is admissible *as part of* the evidentiary showing on how the crimes can benefit the gang. (*Albillar, supra,* 51 Cal.4th at p. 63.) "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement. (*Albillar, supra,* 51 Cal.4th at p. 63.)" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

*1. Count 1-Simple Assault*

*a. Association With and Benefit Of*

Based on the entire record, the jury could reasonably conclude Luker committed the assault in association with and for the benefit of LMP. Monteleone testified respect and status were extremely important in gang culture. He explained a gang member gains status by committing violent crimes and assisting other gang members and conversely loses status by not doing these things. He opined the offense was done in association with gang B because a member of gang B organized and carried out the assault. He also opined the offense was done for the benefit of gang B because gang B and the individual members of gang B's reputations were enhanced because they carried out the assault, instilled fear in the community, and gained the respect of gang A.

Contrary to Luker's claim otherwise, there was sufficient evidence for the jury to conclude the assailants were either LMP gang members or in association with LMP. The record includes sufficient evidence, and Luker does not dispute, he was a member of LMP, and as we explain above, Dyllon was a member of LMP. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617-618 [gang expert may rely on reliable hearsay evidence to form opinion, even if evidence would otherwise be inadmissible].) Luker has not demonstrated the trial court erred by admitting Monteleone's testimony because he

4

was well qualified to testify as an expert on White street gangs. After Luker arranged the assault, Dyllon initiated the assault. This was sufficient evidence they committed the offense in association with LMP.

There was also sufficient evidence the assault benefitted LMP. Monteleone testified a gang member's commission of an offense instills fear in the community and often results in the victim's reluctance to testify. (*Albillar, supra,* 51 Cal.4th at p. 63 [expert opinion criminal conduct benefited gang by enhancing reputation for viciousness can be sufficient to raise inference conduct was committed for benefit of criminal street gang].) There was evidence Crawford did not want to testify and he feared retaliation. Additionally, Monteleone opined that when a member of gang B committed the offense, it earned the respect of gang A. There was evidence that when Stringfellow learned Luker had committed the assault, Stringfellow was pleased with Luker and he called Miranda to tell her to thank Luker. This was sufficient evidence for the jury to conclude Luker committed the assault for the benefit of LMP.

*b. Specific Intent*

The record also supports the conclusion Luker committed the assault with the specific intent to promote, further, or assist criminal conduct by *gang members*. As the *Albillar* court concluded, "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Albillar, supra,* 51 Cal.4th at p. 68.) Here, as we explain above, there was ample evidence Luker arranged the assault on Crawford, and Dyllon, another LMP gang member, initiated the assault. That no one shouted LMP or displayed a gang sign does not negate the other evidence Luker and Dyllon intended to benefit LMP. Thus, there was substantial evidence Luker acted with the specific intent to promote, further, or assist gang members in that criminal conduct.

*c. Petition for Rehearing*

For the first time in his petition for rehearing, Luker argues insufficient evidence supports the jury's finding he committed misdemeanor simple assault for the benefit of a criminal street gang because section 186.22, subdivision (b)(1), applies only to felonies. As an initial matter, we do not address arguments raised for the first time in a rehearing petition. (*People v. Mullens* (2004) 119 Cal.App.4th 648, 669, fn. 9.) Nevertheless, Luker has not demonstrated any error or that it was prejudicial.

In count 1, the second amended information charged Luker with felony assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)), and alleged he committed the crime for the benefit of a criminal street gang, citing to section 186.22, subdivision (b)(1). The jury acquitted Luker of the felony assault count. However, the jury convicted him of the lesser included offense of misdemeanor simple assault, and found true he committed that crime for the benefit of a criminal street gang; the verdict form referenced section 186.22, subdivision (d), not section 186.22, subdivision (b)(1).

Section 186.22, subdivision (d), provides: "Any person who is convicted of a public offense punishable as a felony or a misdemeanor, which is committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall be punished by imprisonment in a county jail not to exceed one year, or by imprisonment in a state prison for one, two, or three years . . . ." Section 186.22, subdivision (d), is an alternate penalty provision. (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 899.)

Luker is correct section 186.22, subdivision (b)(1), applies only to felonies. But he does not discuss section 186.22, subdivision (d), or explain how the jury's verdict was error. It does not appear Luker objected to the jury's finding on this point below, and it was not the subject of his new trial motion, which concerned count 2. Luker does not make the related claim he was not on notice he was subject to the alternate penalty

6

provision in section 186.22, subdivision (d), which mirrors section 186.22, subdivision (b)(1). In any event, Luker has not suffered any prejudice because he was on notice he had to defend against the street terrorism enhancement. (*People v. Sok* (2010) 181 Cal.App.4th 88, 96, fn. 8 [defendant had adequate notice of gang alternate penalty and suffered no prejudice].)

*2. Count 2-Conspiracy to Commit Assault with Force Likely to Produce GBI*

*a. Benefit Of*

Based on the entire record, the jury could also reasonably conclude Luker committed conspiracy to commit assault with force likely to produce great bodily injury (hereinafter the conspiracy) for the benefit of LMP. As we explain above, Monteleone opined the gang member's ability to arrange and execute the assault benefitted gang B because it enhanced gang B's reputation as a violent criminal street gang. Additionally, gang B's ability to complete the assault at the request of gang A earned gang A's respect. The record demonstrates Stringfellow left Luker a voicemail message asking him to speak with Miranda who would instruct him what Stringfellow wanted him to do. During a later telephone call with Prescott, Stringfellow learned Luker completed the assault. From this evidence the jury could reasonably conclude Luker and Stringfellow conspired to commit an assault and this increased Luker's and LMP's reputation in the community thereby benefitting LMP. This was sufficient evidence for the jury to conclude Luker committed the conspiracy for the benefit of LMP.

*b. Specific Intent*

The record also supports the conclusion Luker committed the conspiracy with the required specific intent. Monteleone testified gang B organized and completed a violent assault at the request of gang A in retaliation for disrespecting someone and gang B's and the gang member's reputation were enhanced in the community, which made it easier for gang B to commit future crimes. Commission of the conspiracy also promoted gang B because it earned the respect of gang A. The evidence demonstrated that after

7

Stringfellow left Luker the voicemail message, Luker organized the assault. The fact Luker was the only member of LMP involved in the conspiracy as charged does not alter our conclusion.[2] (*People v. Rios* (2013) 222 Cal.App.4th 542, 563-564 [lone actor can violate § 186.22, subd. (b)(1)].) This was sufficient evidence Luker committed the conspiracy with the specific intent to promote, further, or assist criminal conduct by LMP. Thus, based on the entire record, there is sufficient evidence supporting the jury's conclusion Luker committed counts 1 and 2 for the benefit of a criminal street gang. (*Jackson, supra,* 443 U.S. at pp. 318-319; *Johnson, supra,* 26 Cal.3d at pp. 576-577.)"

This modification does not effect a change in judgment.

The petition for rehearing is DENIED.



O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.

---

[2]    In his rehearing petition, Luker cites to *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), a California Supreme Court case filed after briefing was complete in this case, to argue there was no evidence PENI and LMP shared an organizational or structural connection. *Prunty* is inapplicable here because that case involved subsets of the same gang (*id*. at p. 67), circumstances not present in this case.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>DANIEL LUKER,<br><br>　　Defendant and Appellant. | G050566<br><br>(Super. Ct. No. 12CF1048)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Joanne Motoike, Judge.  Affirmed.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Ryan H. Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

Daniel Luker appeals from a judgment after a jury convicted him of simple assault, conspiracy to commit assault with force likely to produce great bodily injury, and street terrorism, and found true street terrorism enhancements. Luker argues the trial court erred by admitting evidence and insufficient evidence supports his convictions. None of his contentions have merit, and we affirm the judgment.

FACTS

In March 2012, Devlin Stringfellow was in custody at Theo Lacy Jail. Jailers intercepted a "kite," an inmate-to-inmate letter, which included Stringfellow's booking number. Stringfellow was associated with a White gang called "P.E.N.I." or "Public Enemy Number One" (PENI). Jailers forwarded the kite to Deputy Sheriff William Beeman of the intelligence unit. Beeman began listening to Stringfellow's telephone conversations. Beeman listened to over 100 recorded calls between Stringfellow and primarily his mother Rose Miranda and his girlfriend Star Prescott. Stringfellow believed Jacob Crawford had disrespected his mother while Stringfellow was in custody.

One of those calls was to Prescott on the evening of February 19, 2012.[1] Prescott placed Stringfellow on hold and called Luker to facilitate Stringfellow speaking with Luker in a three-way call. Luker did not answer, but Stringfellow left the following voicemail message: "Hey Danny its Dev. Hey . . . Mom's got a message for you. Hey, hey me to you dawg, fuckin uh, please handle that homie, that means a lot to me. And I and I'd do the same for you and you'll know what I'm talkin about when uh, when she tells you. That's my heart right there, and uh, totally unacceptable homie like I love you fool and I'll see you when I see you. Alright bro, bye."

---

[1] Below, in section I, we address Luker's contention the trial court erred by admitting evidence of this call.

About 30 minutes later, Stringfellow called Prescott again.  She again placed him on hold and this time she called Miranda, who lived about three miles away from Luker.  The following colloquy occurred:

"Stringfellow:  Did Danny come by?

"Miranda:  Yea, he came.  [¶]  He said don't worry about nothing.  He was laughing.  He said he'd, 'wallop him.'

"Stringfellow:  All right, cool.

"Miranda:  He hasn't been at the house he said, since that night.  But I think he has.  But you know he's staying there?

"Prescott:  Oh wow.

"Stringfellow:  Who, my buddy?

"Miranda:  Yea."

The next evening, Stringfellow called Prescott, she placed him on hold, and she called Luker, who answered this time.  Luker told Stringfellow that he received the money Stringfellow owed him and he was not affiliated with PENI.

Two days later, Stringfellow called Prescott and she said, "Done deal."  When Stringfellow asked whether it was good, she said, "It was good."  Stringfellow asked Prescott to call Luker and the call disconnected.  Eleven minutes later, Stringfellow called Prescott, and the following colloquy occurred:

"Stringfellow:  Yea, so lookit, umm, so the homeboy just said that hay homie that was done and it was all good.

"Prescott:  Right.

"Stringfellow:  He said so homeboy has a headache right now?  Or what?

"Prescott:  Huh?

"Stringfellow:  So homeboy has a headache right now or what?

"Prescott:  Homeboy has a headache right now?

"Stringfellow:  Yeah!

3

"Prescott:  Right?

"Stringfellow:  You'd think, right?

"Prescott:  You'd think.

"Stringfellow:  Alright.

"Prescott:  Yeah."

The following day, Stringfellow spoke with his mother, Miranda, and told her Luker "talked to that one person[]" "[r]eally sternly" and she should call and thank him.

The next day, Crawford was at Ray Edelman's house to fight, which he believed would be a one-on-one fight.  Edelmon, Luker, and Luker's girlfriend, Breeana Chacon, told Crawford he would have to fight or things would be worse for him.  Crawford initially had his back turned toward Edelmon and Josh Valentine, who were watching.  Chacon's brother, Dyllon Chacon (Dyllon), initiated the fight by attacking Crawford.  Crawford eventually got on top of Dyllon, pinned him on the ground, and hit him.  At that point, others attacked Crawford from behind, hitting him in the back of the head and kicking him in the torso.  Crawford curled up to protect himself until they stopped hitting and kicking him.  Everyone gave Crawford a hug and a beer, and they all went inside and did drugs.  After the fight, Crawford learned it had been recorded on Edelman's cell phone.

Four days later, Luker spoke to Stringfellow on the phone.  Luker said, "'So that fucking -- that little Jacob deal, they fucking videotaped that for you, dawg.'" About a month later, while Luker was in Theo Lacy Jail, jailers obtained a kite written by Luker.  The kite said, "'I just realized I need a message out of wall.  Ask her if Jacob knows the investigators came and seen me about him.  Make sure that the video they're looking for destroy immediately where everyone goes down.  Tell him not to say this name on the phone ever.'"

4

A second amended information charged Luker with the following: assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4), all further statutory references are to the Pen. Code, unless otherwise indicated) (count 1); conspiracy to commit assault with force likely to produce great bodily injury (§ 182, subd. (a)(1)) (count 2); and street terrorism (§ 186.22, subd. (a)) (count 3). The information alleged Luker committed counts 1 and 2 for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The information also alleged he suffered two prior serious and violent felony convictions (§§ 667, subds. (a)(1), (d), (e)(2)(A), 1170.12, subds. (b), (c)(2)(a)), and three prior prison terms (§ 667.5, subd. (d)).

Before trial, Luker objected to admission of the transcripts of seven telephone calls because they were irrelevant and hearsay. At a hearing, the prosecutor argued the February 19, 2012, voicemail message Stringfellow left Luker was "the beginning[]" of the conspiracy. The prosecutor asserted Stringfellow called Prescott to try to make contact with Luker. Defense counsel objected to admission of calls that occurred before the assault, as occurring before the conspiracy was formed. Counsel acknowledged Stringfellow called Prescott to have her call Luker and "[w]e know it's to the recipient of the call." After narrowing the calls in dispute to three, the trial court ruled evidence of the February 11, 2012, and February 19, 2012, calls were admissible pursuant to Evidence Code section 1223 subject to foundational requirements at trial.

At trial, Beeman testified concerning Stringfellow's telephone calls, including the February 19, 2012, voicemail message he left Luker. That voicemail message was played for the jury. After detailing his background, training, and over 10 years experience investigating gangs, primarily White gangs, Beeman agreed when asked whether the entire Chacon family was "involved" with "La Mirada Punks" (LMP).

The prosecutor offered the testimony of gang expert Deputy Sheriff Don Monteleone. After detailing his background, training, and experience, Monteleone testified concerning the culture and habits of gangs, specifically White gangs. In addition

5

to the regularly repeated testimony about how to join a gang, the importance of tattoos, the consequences of claiming a gang, and the concept of gang allies and rivals, Monteleone explained the importance of violence and respect. He stated committing violent acts is how a gang member earns respect for himself and the gang and the level of respect correlates with the level of violence. Conversely, he said a gang member can lose respect and become disfavored by failing to follow rules and orders, including by not answering challenges, not retaliating when necessary, not backing up other gang members, and talking with the police. He added that if a gang member feels he has been disrespected, retaliation is often the result. He said gang members gain status by committing violent acts, assisting other gang members, and giving money to, talking with, and writing to gang members who are in custody. He explained getting "checked" is being assaulted and getting "smashed" is more severe than being checked. Finally, he stated victims and witnesses are reluctant to testify because they fear retaliation.

Monteleone testified he was familiar with "La Mirada Punks" (LMP), through investigating crimes committed by its members and speaking with gang investigators and gang members. He stated LMP gang members commit assaults with a deadly weapon, methamphetamine possession and sales, and conspiracies to commit murder. He explained LMP started in La Mirada in the 1970's as a group of punk rockers who would go to concerts and it evolved into a White gang that committed assaults throughout Los Angeles and Orange counties. He stated that in February 2012, LMP had over 25 active participants and over 50 members and associates, and its primary activities were drug sales, weapons possession, and vehicle theft. He said one of its symbols was "567" the numbers on a telephone that correspond to LMP, and other symbols include swastikas, Adolf Hitler, the numbers 14 and 88, runes, and Odin's cross. He also testified concerning the statutorily required predicates offenses involving Matthew Stevens and Joshua Coover. He stated White street gangs are transient and criminally motivated. He added PENI is a White street gang. He explained the White street gang hierarchy. He

6

stated the supreme White gang is the Aryan Brotherhood.  He added that the Aryan Brotherhood gives orders to lower White street gangs through PENI.  Finally, he said LMP would be required to assist PENI if PENI asked.

Monteleone testified regarding Luker, who he knew through personal contacts with him and investigating him.  Monteleone explained that in February 2012, officers executed a search warrant at a residence and found Luker wearing a T-shirt with 567 on it and officers found other LMP gang indicia, including photographs on Luker's social media pages.  When the prosecutor showed Monteleone a photograph of Chacon, Dyllon, Chacon and Dyllon's mother, Nico Tellez, Gina Ann Daughtry, and Luker, Monteleone opined the three members of the Chacon family were active participants of LMP.  He said three of the people in the photograph were showing gang signs which spelled LMP, with Luker displaying the "P" and Dyllon either displaying the "L" or pointing at the other members.  Monteleone said another photograph showed Luker and Rob Elmquist, an active participant in LMP.  He stated another photograph showed Luker with Joseph Lutillio, Brian Morales, Anthony Torres, and Shane Butler, all active participants of LMP.  He said another photograph showed Luker with Thomas Tellez, "a high-ranking well-respected member of LMP."  When shown other photographic exhibits, he described Luker's numerous White supremacist tattoos, including a tattoo of a swastika on his penis.  Monteleone also stated he had reviewed police reports documenting Luker associating with other known LMP gang members.  Monteleone also said that in March 2012, Luker admitted to a jail officer he was a member of LMP with the gang moniker "Caveman."  Based on his personal contacts with Luker and his investigation of him and of this crime, Monteleone opined Luker was an active participant of LMP at the time of the incident.  He also opined Edelmon was an associate of White street gangs and Valentine was an "Orange County Skins" (OCS) gang member. He did not believe Crawford was affiliated with a gang.

7

Based on a hypothetical question matching the facts of the case, Monteleone testified the offense was done for the benefit of, in association with, and at the direction of a criminal street gang because it demonstrated the gang's "ability to organize and carry out the assault." He added the gang's and gang member's reputation was enhanced because it established the gang could carry out the assault on behalf of the other gang. He also stated the offense was done with the intent to promote, further, or assist criminal conduct because the gang carried out a violent assault and enhanced its reputation in the community because victims and witnesses would be reluctant to testify. He also said the offense showed the gang member is an active participant of the gang because he had the ability to orchestrate the assault on behalf of the gang.

On the prosecutor's motion, the trial court admitted the transcript of Crawford's conditional exam interview. A DVD of the exam was played for the jury. Crawford stated he did not want to testify. Crawford stated he was not a gang member but admitted he associated with gang members from PENI, LMP, and OCS. He knew Stringfellow to be a member of PENI and Luker was "inactive" with LMP. Crawford stated he was afraid of PENI. After testifying concerning the incident, Crawford stated he did not call the police. Crawford stated that based on his knowledge of how street gangs operate, he feared retaliation for testifying because, as he put it, "snitches get stitches."

The jury acquitted Luker of count 1 but convicted him of the lesser included offense of simple assault. The jury also convicted him of counts 2 and 3. The jury found true the gang allegations as to count 2 (§ 186.22, subd. (b)(1)), and misdemeanor count 1 (§ 186.22, subd. (d)).

At a hearing, the trial court found true one of two prior serious felony convictions and not true the prior prison term allegations. The court denied Luker's motion for new trial and to modify the jury's verdict on count 2. The court sentenced Luker to 12 years in prison.

8

The next month there was a second sentencing hearing before Judge Daniel McNerney to correct sentencing errors. The trial court sentenced Luker to 11 years in prison as follows: count 2-low term of two years doubled to four years; count 2's street terrorism enhancement-two years; and serious felony conviction-five years.

DISCUSSION

I. *Admission of Evidence*

Luker argues the trial court erred by admitting evidence of Stringfellow's February 19, 2012, voicemail message to Luker pursuant to Evidence Code section 1223 because the statement was made before the conspiracy existed. We disagree.

"'Hearsay evidence is of course generally inadmissible. (Evid. Code, § 1200.) Hearsay statements by coconspirators, however, may nonetheless be admitted against a party if, at the threshold, the offering party presents "independent evidence to establish prima facie the existence of . . . [a] conspiracy." [Citations.] Once independent proof of a conspiracy has been shown, three preliminary facts must be established: "(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy." [Citation.]' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 871 (*Homick*).)

"In order for a declaration to be admissible under the coconspirator exception to the hearsay rule, the proponent must proffer sufficient evidence to allow the trier of fact to determine that the conspiracy exists by a preponderance of the evidence. A prima facie showing of a conspiracy for the purposes of admissibility of a coconspirator's statement under Evidence Code section 1223 simply means that a reasonable jury could find it more likely than not that the conspiracy existed at the time the statement was made." (*People v. Herrera* (2000) 83 Cal.App.4th 46, 61, 63.) No particular order of proof is required. The trial court has the discretion to admit the

9

hearsay statement before the foundation has been established, subject to the prosecutor's offering evidence of the conspiracy. (Evid. Code, § 1223, subd. (c).) We review a trial court's admission of evidence under Evidence Code section 1223 for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

Here, the trial court properly admitted evidence of Stringfellow's February 19, 2012, voicemail message to Luker because the prosecutor offered evidence at trial from which a reasonable jury could find it more likely than not the conspiracy existed at the time the statements were made. The evidence demonstrated Stringfellow left Luker a voicemail message telling him that his mother, Miranda, had a message for Luker. Stringfellow added, "please handle that homie," and Luker would understand what Stringfellow was talking about "when [Miranda] tells you." About 30 minutes later, Stringfellow spoke to Miranda, who told him Luker came by and told her, "he'd, 'wallop him.'" This was some evidence a conspiracy existed at the time Stringfellow called Luker because it was Miranda who in part had to provide Luker with the details.

Additionally, Prescott facilitated making both these telephone calls and in subsequent conversations with Stringfellow, Prescott made statements indicating she knew why Stringfellow needed to speak with Luker, including it was a "done deal" and he, presumably Crawford, had a "headache." This too was some evidence a conspiracy existed at the time Stringfellow called Luker. From this evidence the jury could conclude it was more likely than not that the conspiracy to assault Crawford existed at the time Stringfellow called Luker. In particular, the conspiracy can "'be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.)

Luker's reliance on *Homick, supra,* 55 Cal.4th at page 872, is misplaced because in that case the statements were made months before the conspiracy was formed.

10

Here, as we explain above, there was circumstantial evidence to support the conclusion Stringfellow made his statements *during* the conspiracy.

Luker complains the prosecutor below did not argue Miranda and Prescott were part of the conspiracy and thus the conspiracy was formed before Stringfellow called Luker. Luker claims the Attorney General cannot now advance that theory of admissibility on appeal. Below, the trial court admitted the call pursuant to Evidence Code section 1223 subject to the prosecutor satisfying the foundational requirements at trial. This is permissible as no particular order of proof is required. (Evid. Code, § 1223, subd. (c) [trial court has discretion to admit hearsay statement before foundation has been established, subject to prosecutor's offering evidence of the conspiracy].) As we explain above, at trial the prosecutor offered some evidence the conspiracy existed before Stringfellow called Luker because Prescott facilitated the calls and Miranda disclosed the details of the plan.

Finally, to the extent Luker claims Stringfellow did not call him or he never received the message, that is belied by the record. At the hearing on the admissibility of the statement, when the trial court inquired whether defense counsel disputed Stringfellow called Luker, counsel replied, "We know it's to the recipient of the call." Moreover, no more than 30 minutes after the voicemail message, Luker was at Miranda's house. We conclude the trial court did not abuse its discretion by admitting Stringfellow's February 19, 2012, voicemail message to Luker pursuant to Evidence Code section 1223.

## II. *Sufficiency of the Evidence*

"In considering a challenge to the sufficiency of the evidence . . . , [the appellate court] review[s] the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] [It] presume[s] every fact in

11

support of the judgment the trier of fact could have reasonably deduced from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'  [Citation.]"  (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

*A.  Conspiracy*

In his opening brief, Luker contends insufficient evidence supports his conviction for count 2 because there was no evidence he "actually agreed" to "organize and carry out an aggravated assault on Crawford."  In a rather conclusory argument, Luker asserts he did not agree to assist Stringfellow, describing his conduct as an "attempt[] to mollify Stringfellow."  Luker presents no analysis of the specific intent element.  He changes tack in his reply brief, contending the evidence was insufficient to establish the specific intent element.

Generally, a contention raised for the first time in a reply brief that could have been raised in the opening brief will not be considered because the respondent has been denied an opportunity to respond to the contention.  (*People v. Tully* (2012) 54 Cal.4th 952, 1075.)  However, to forestall a potential claim appellate counsel was ineffective, we will address all of Luker's contentions.

"A conspiracy is an agreement by two or more persons to commit any crime.  [Citations.]  A conviction for conspiracy requires proof of four elements:  (1) an agreement between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy.  [Citations.]  [¶]  The elements of conspiracy may be proven with circumstantial evidence, 'particularly when those circumstances are the defendant's carrying out the agreed-upon crime.'  [Citations.]  To prove an

12

agreement, it is not necessary to establish the parties met and expressly agreed; rather, 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.' [Citation.]" (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024-1025.)

Here, there was sufficient evidence Luker agreed to and specifically intended to conspire with his coconspirators to commit an aggravated assault on Crawford. Again, the evidence demonstrated Stringfellow left Luker a voicemail message telling him that his mother, Miranda, had a message for Luker. Stringfellow added, "please *handle* that homie" (italics added), and Luker would understand what Stringfellow meant "when [Miranda] tells you." The evidence established that less than 30 minutes later, Luker told Miranda that he would "wallop" Crawford. At some point, Luker told Crawford he needed to fight. Days later, Crawford encountered three men in a dark garage, Chacon and two other men, while Edelmon recorded the incident on his cell phone. When Crawford got the upper hand in the fight with Chacon, two men violently attacked Crawford from behind. Based on Stringfellow's voicemail message to Luker and Luker's comment to Miranda, the jury could reasonably conclude Luker organized and arranged for three men to commit an aggravated assault on Crawford.

Luker's primary complaint is that at worst he specifically intended to commit a simple assault and not an aggravated assault. Luker cites to Crawford's testimony Luker told him he would have to fight him "one on one" and the meanings of "smashed," "handled," and "walloped." As we explain above, the record includes evidence Stringfellow asked Luker to commit or arrange an attack, Luker told Stringfellow's mother he would attack Crawford, and Luker arranged for three people to attack Crawford. Whether Crawford was "smashed" or "walloped," whether he went to the hospital, or whether he reported the incident is immaterial. A call was made, a promise pledged, and a violent assault executed. The common link between the call and the assault was Luker. Whether the result was an aggravated assault or a simple assault is

13

immaterial. (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1130-1131 [completion of crime of conspiracy does not require object of conspiracy be accomplished].) Thus, under both the federal and state due process clauses, sufficient evidence supports the jury's conclusion Luker agreed with his conspirators and specifically intended to commit an aggravated assault on Crawford. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319 (*Jackson*); *People v. Johnson* (1980) 26 Cal.3d 557, 576-577 (*Johnson*).)

B. *Street Terrorism Substantive Offense*

Luker asserts insufficient evidence supports his conviction for count 3 because there was no evidence he committed the offense with other LMP gang members. Not so.

The street terrorism substantive offense, section 186.22, subdivision (a), states: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished . . . in the state prison for 16 months, or two or three years." There are three elements to the substantive street terrorism offense: (1) active participation in a criminal street gang; (2) knowledge the gang's members have engaged in a pattern of criminal gang activity; and (3) willfully promoting, furthering, or assisting in any felonious criminal conduct by members of the gang. (*Albillar, supra,* 51 Cal.4th at p. 56.)

Here, Luker disputes only the third element. He assumes for sake of argument LMP was a criminal street gang and he was an active participant in LMP. He disputes though there was any evidence establishing he committed the offenses with other LMP gang members. As we explain below, there was.

In *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1128-1129 (*Rodriguez*), defendant acted alone in committing an attempted robbery. A jury convicted him of attempted robbery and active participation in a criminal street gang under section 186.22,

14

subdivision (a). The issue in *Rodriguez* was whether the element of willfully promoting, furthering, or assisting in any felonious criminal conduct by members of the defendant's gang—can be satisfied by felonious criminal conduct committed by the defendant acting alone. (*Rodriguez, supra,* 55 Cal.4th at p. 1129.) The court reasoned "[t]he plain meaning of section 186.22[, subdivision] (a)[,] requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member. [Citation.]" (*Rodriguez, supra,* 55 Cal.4th at p. 1132.) Because the defendant acted alone, he did not violate section 186.22, subdivision (a). (*Rodriguez, supra,* 55 Cal.4th at p. 1139.)

Here, there was sufficient evidence Luker committed the offenses with other LMP gang members, specifically Dyllon. Monteleone testified concerning his experience investigating White gangs. He explained he spoke with gang investigators and gang members, reviewed police reports, and examined gang documentation. When shown a photograph, Monteleone explained it depicted Luker, Dyllon, and others displaying the LMP gang sign. Although Monteleone acknowledged Dyllon could have been pointing at the other people in the photograph, it appeared he was displaying the letter "L." Most importantly, when asked Monteleone opined Dyllon, Chacon, and their mother were active participants in LMP. The testimony of a single witness, unless the testimony is inherently improbable or physically impossible, is sufficient to support a conviction. (*People v. Brown* (2014) 59 Cal.4th 86, 106.) Additionally, Beeman agreed the entire Chacon family was "involved" with LMP. Their testimony provided sufficient evidence Dyllon was a LMP gang member and therefore Luker did not act alone in committing the offenses.

Luker relies on *People v. Johnson* (2014) 229 Cal.App.4th 910, 922 (*Johnson*), to argue he acted alone. His reliance on *Johnson* is misplaced. In that case, the court reversed defendant's conviction for street terrorism when neither of the other two gang members were involved in acquiring or exercising dominion and control over

15

the gun, the alleged felonious criminal conduct. As we explain above, Dyllon was involved in the alleged felonious criminal conduct because he was the person who initiated the attack on Crawford. Based on the entire record, the jury could reasonably conclude Luker, an LMP gang member, enlisted the help of Dyllon, another LMP gang member, to assault Crawford. Thus, based on the entire record, there is sufficient evidence supporting Luker's conviction under both the federal and state constitutional due process clauses. (*Jackson, supra,* 443 U.S. at pp. 318-319; *Johnson, supra,* 26 Cal.3d at pp. 576-577.)

*C. Street Terrorism Enhancement*

Luker argues insufficient evidence supports the jury's findings he committed counts 1 and 2 for the benefit of a criminal street gang. Again, we disagree.

"[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . . ." (§ 186.22, subd. (b)(1).)

In *Albillar, supra,* 51 Cal.4th at page 60, the California Supreme Court explained that although not every crime committed by gang members is related to a gang for purposes of the first prong, a crime can satisfy the first prong when it is gang related. The *Albillar* court also explained the second prong, which requires the defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1)), need not encompass proof the defendant committed the crime with the specific intent to promote, further, or assist other criminal conduct by gang members. Instead, that subdivision "encompasses the specific intent to promote, further, or assist in *any* criminal conduct by gang members—

16

including the current offenses—and not merely *other* criminal conduct by gang members." (*Albillar, supra,* 51 Cal.4th at p. 65.)

The *Albillar* court stated a gang expert's opinion is admissible *as part of* the evidentiary showing on how the crimes can benefit the gang. (*Albillar, supra,* 51 Cal.4th at p. 63.) "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement. (*Albillar, supra,* 51 Cal.4th at p. 63.)" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

Here, sufficient evidence supports both elements of the street terrorism enhancement. First, the record includes evidence from which the jury could reasonably conclude the offense was gang related. The record includes evidence Stringfellow was a member of PENI, and Monteleone testified regarding White gang hierarchy, including that the Aryan Brotherhood is the supreme White gang that gives orders through PENI and LMP would have to follow PENI's orders. The record includes sufficient evidence, and Luker does not dispute, he was a member of LMP, a criminal street gang, and as we explain above, Dyllon was a member of LMP. When Crawford disrespected Stringfellow's mother, PENI member Stringfellow arranged for subordinate White gang members to retaliate—he enlisted LMP member Luker who in turn enlisted LMP member Dyllon to assault the person who disrespected Stringfellow's mother. Monteleone testified at length about the importance of respect within gangs, and what happens when a gang member feels disrespected—retaliation. Luker and Chacon, among others, told Crawford that to make things right, he would have to be assaulted. Finally, Monteleone opined the offense benefitted the gang because it demonstrated the gang could carry out the assault on behalf of the other gang. The evidence demonstrated the offense was gang related and its major players were gang members.

Second, the record includes evidence from which the jury could reasonably conclude the offense was done with the specific intent to promote, further, or assist in *any*

17

criminal conduct by gang members. Again, there was evidence Luker, a member of LMP, recruited fellow LMP gang member Dyllon to assault Crawford on behalf of PENI gang member Stringfellow. When discussing the culture and habits of White street gangs, Monteleone explained gang members can lose respect by not following rules and not retaliating when necessary. Monteleone opined the offense was done with the specific intent to benefit the gang because it showed the gang committed a violent assault in retaliation for disrespecting someone and that increased its reputation in the community. Monteleone's expert testimony, and the evidence on which it was based, was sufficient evidence the offense was committed with the specific intent to promote LMP. Thus, based on the entire record, there is sufficient evidence supporting the jury's conclusion Luker committed count 2 for the benefit of a criminal street gang. (*Jackson, supra,* 443 U.S. at pp. 318-319; *Johnson, supra,* 26 Cal.3d at pp. 576-577.)

DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

FYBEL, J.

THOMPSON, J.

18