Filed 6/20/22 P. v. Turner CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075454 |
| v. | (Super.Ct.No. RIF1606009) |
| ABIANCE LINECE TURNER, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Mac R. Fisher, Judge. Reversed.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Melissa A. Mandell, Assistant Attorneys General, A. Natasha Cortina, Paige B. Hazard and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

1

Abiance Linece Turner drove one of two cars involved in a shooting that left two men dead and a third wounded. At trial, the People argued that Antoine James and Anthony Eddington were the shooters and that Turner directly aided and abetted the charged offenses. The jury convicted Turner of two counts of first degree murder, one count of attempted premeditated murder, and one count of participation in a criminal street gang. (Pen. Code, §§ 186.22, subd. (a), 187, subd. (a), 189, subd. (a), 664; unlabeled statutory citations refer to the Penal Code.)

Turner argues that the jury's implied finding that she intended to kill is not supported by substantial evidence, and we agree. The insufficiency of the evidence requires reversal of her murder and attempted murder convictions, as well as her conviction for participation in a criminal street gang. Like the other convictions, that conviction was based on the theory that Turner directly aided and abetted the shooters with intent to kill. Accordingly, we reverse the judgment in its entirety.

BACKGROUND

I. *The Shooting and the Investigation*

The shooting at issue occurred in October 2015, outside a liquor store on the northwest corner of Kansas Avenue and Seventh Street in Riverside. Surveillance video from multiple angles depicted the following events: At approximately 9:30 p.m., Francisco Ramirez was standing on the corner outside the store, talking on a cell phone. Two northbound cars on Kansas Avenue stopped at that intersection and turned left onto

2

westbound Seventh Street. Turner was driving the second of the two cars.[1] The lead car pulled over to the right on Seventh Street, and the passenger (shooter one) exited. Turner followed the lead car, made a U-turn, and pulled over on the opposite side of the street from the lead car. Shooter one walked east toward the corner where Ramirez was standing. Turner turned off her headlights and drove forward slowly, following shooter one from across the street.

In the meantime, Esteban Domingo and Juan Bartolo were on Kansas Avenue walking south toward Ramirez.[2] They turned right at the corner onto Seventh Street. As they walked west, away from Ramirez, shooter one passed them heading toward Ramirez. Shooter one walked a few steps past Ramirez, turned around, and came up behind Ramirez. He appeared to say something to Ramirez, who tried to walk away. Shooter one then appeared to shove Ramirez before taking his right hand out of his sweatshirt pocket, putting it to Ramirez's head, and shooting him.

Domingo and Bartolo turned around to look behind them. Shooter one jogged toward them and the lead car, which was still parked on the north side of Seventh Street. As Domingo and Bartolo moved apart to let shooter one through, the driver of the lead car (shooter two) exited the car. Shooter one jogged between Domingo and Bartolo, and shooter two then fired at them. Shooters one and two quickly got into the lead car, made

---

**1**    The identities of the drivers and shooters is not evident from the surveillance video. But on appeal, Turner concedes that she was driving the second car. After describing the shooting, we summarize the evidence establishing Turner's identity.

**2**    In the record, Domingo is also referred to as Antonio Jose Domingo and Domingo Esteban.

a U-turn, and drove off. Turner was at the corner of Kansas Avenue and Seventh Street, made a U-turn, and then made another U-turn to follow the lead car away from the scene.[3]

Bartolo and Domingo died from their gunshot wounds. Ramirez survived the shooting but was unconscious for over a week. When he awoke, he gave a written statement about the shooting to the police. In the written statement, Ramirez said that a man threatened to kill Ramirez if he did not give him money, and Ramirez replied that he did not have any money. At trial, Ramirez testified that he remembered the man asking him for money and threatening to kill him. He also testified that he recalled writing the statement and that he tried to be as truthful as possible in it.

Turner's cell phone records showed that at the time of the shooting, from 9:18 p.m. to 9:36 p.m., her cell phone connected several times to the two cell towers closest to the crime scene. Witnesses described the second car involved in the shooting as maroon and similar to a Honda Accord. Turner's mother was dating a man who owned a maroon Chevy Impala. He allowed Turner's mother to use the car, and Turner's mother allowed Turner to use it. Turner was seen driving the car in San Diego in March 2015. Photographs posted on Facebook also depicted Turner with the maroon Chevy Impala.

In August 2016, at the request of the investigating officers, the San Diego County Sheriff's Department told Turner that Riverside police officers were going to contact her

---

[3] The People argued at trial that James was the passenger in the lead car and shooter one, and Eddington was the driver of the lead car and shooter two.

4

about a double homicide. The investigating officers "ha[d] access" to Turner's phone calls, and they were hoping that she would make some calls discussing the homicide. That same day, Turner called an unknown man and told him about the encounter with the Sheriff's Department. Turner said that she did not understand why the officers wanted to talk to her about a double homicide. The man said: "You need to be thinkin' about that time when you, ya know, when you was in the Chevy and them motherfuckers they was shootin' and shit and you got on, you know what I'm sayin'? That's probably what it was about." Turner agreed and said: "Well that's nothin' then. Shit. I got gone. Same what—what an average motherfucker would do."

In September 2016, law enforcement interviewed Turner about the shooting. She told the officers to "figure it out" and "just do [their] job." After the interview, Turner again called an unknown man. She told the man what she had said to the officers. He advised her: "[Y]ou shoulda just told 'em the truth. I didn't see shit. I was there. I heard the shot. That's it. And I got on. That's the truth. You shoulda said that." He reiterated that she should have told them "the truth," which was that she heard some shots and sped off. He said that they did not have any witnesses saying that she had "somethin[g] to do with it," unless she was not telling him everything. She promised that she had told him everything and said, "I was just right there like I . . . ." He advised her not to worry.

Law enforcement also interviewed Turner's mother about the shooting in September 2016. A few days before the interview, the Riverside Police Department updated its Facebook page with the surveillance video from the shooting, and the

5

department asked for the public's help in solving the crime. The Facebook page also described one of the involved cars as a black Dodge Charger. After the law enforcement interview, Turner's mother called James, and James then called Eddington twice. James urged Eddington to get rid of his car. Eddington replied that law enforcement was looking for a Dodge Charger, and his car was not a Charger. James persisted and suggested that Eddington paint the car; Eddington suggested that he get into a car accident instead. James told Eddington that it was good Turner's mother had talked to law enforcement, because she relayed a conversation to him that "opened up a lot of shit." They also discussed a video that had been posted online, and Eddington was "laughing to [him]self," because there was "no way" anyone could be identified in the video. James said that he was worried.

II. *Gang Evidence*

Detective David Riedeman of the Riverside Police Department testified as the People's gang expert. Riedeman opined that James and Eddington were members of the 1200 Blocc Crips gang. The 1200 Blocc Crips are a Black gang whose territory is on the east side of Riverside. In 2015, there were 150 documented members of the gang. The gang's primary activities were drug dealing, assaults, and robberies.

The Bogarts were a "crew" or "squad" within the 1200 Blocc Crips. Riedeman had identified five Bogart members, including Eddington. And in an April 2015 video found on James's phone, James identified himself as "General of the Bogart squad." The video was recorded at a barbershop where 1200 Blocc Crips often gathered after hours. James was recording a rap in the video, and several other 1200 Blocc Crips members

6

were present.  Some of James's lyrics referred to shooting people and being "known for the pistol."  But Riedeman did not "take rap lyrics to be truth" without other evidence corroborating the lyrics, because gang members commonly "rap about violent things that they may or may not have committed."

Riedeman also opined that Turner was an associate of the 1200 Blocc Crips.  An associate "may help with some things" and "hang[] out" with the gang members, but the associate is not a member.  Associates might help by holding guns or drugs or passing information.  Riedeman was not aware of any female members (as opposed to associates) of the 1200 Blocc Crips.

Riedeman based his opinion about Turner on the video of James rapping at the barbershop, as well as text messages between Turner and James.  Turner appeared in the video with the 1200 Blocc Crips members, and at one point she is shown making the hand sign for the gang.

As for the text messages between Turner and James, Riedeman testified about seven text message conversations from April, May, and June 2015.  James called Turner "Princess," which Riedeman believed was her moniker.  Riedeman had heard that Turner was James's girlfriend, but he did not "know for sure."  Their text messages included references to the 1200 Blocc Crips or slang used by the gang.  For instance, the conversations repeatedly mentioned the Bogarts.  In one of those messages, James invited Turner to a Bogart meeting.  Riedeman opined that such an invitation meant that the associate was active and trusted by the gang members.  In another message, James referred to Turner as one of "my Bogarts," and he expressed appreciation for "looking

7

out for [her] other Bogarts." He also told her, "I love you Bogart." In another message, James and Turner discussed going to see a rapper who was a 1200 Blocc Crips member.

The 1200 Blocc Crips' biggest rival is Eastside Riva. Eastside Riva is a Hispanic gang whose territory overlaps the 1200 Blocc Crips' territory in many areas. The shooting in this case occurred at an Eastside Riva stronghold.

In 2015, there were "a lot of shootings" between the 1200 Blocc Crips and a certain Eastside Riva clique. Riedeman opined that the 1200 Blocc Crips would benefit from one of their members killing a Hispanic male at an Eastside Riva stronghold, even if the victim were not a gang member. The killing would still inspire fear in the community generally and respect in the gang community.

Riedeman testified that in every gang, the members are expected to "back each other up." Thus, when one gang member gets into an altercation, the other members would be expected to back up that person "if things [get] physical." A "lookout" watches for police or anyone else who might interrupt whatever crime is being committed, and the lookout might also distract the police.

III. *Relevant Procedural Background*

Eddington died in a shootout with law enforcement in December 2016. In late 2019, Turner and James were tried jointly but before separate juries. (James is not a party to this appeal.) The People charged Turner with the murders of Bartolo and Domingo, the attempted premeditated murder of Ramirez, and participation in a criminal street gang. (§§ 186.22, subd. (a), 187, subd. (a), 189, subd. (a), 664.) The information also alleged that Turner committed multiple murders; that Bartolo and Domingo were

8

intentionally killed because of their race, color, religion, or national origin; and that they were intentionally killed while Turner was an active participant in a criminal street gang. (§ 190.2, subd. (a)(3), (16), (22).) In addition, the information alleged gang and firearm enhancements with the murder and attempted murder counts. (§§ 186.22, subd. (b)(1), 12022.53, subds. (d), (e).)

The court instructed Turner's jury on a single theory of accomplice liability: direct aiding and abetting. More specifically, the court instructed the jurors that "[a]n aider and abettor must share with the perpetrator the specific intent to kill the actual individuals killed or attempted to be killed." The People told the jurors in closing argument that this was "an express malice case" and that every count required Turner to have "specific intent to kill."

The jury found Turner guilty of the first degree murders of Bartolo and Domingo, the attempted premeditated murder of Ramirez, and participation in a criminal street gang. The jury also found all of the enhancement and special circumstance allegations to be true.

The court sentenced Turner to two terms of life in prison without the possibility of parole for the murders, plus another 82 years to life in prison for the remaining counts and enhancements.

9

DISCUSSION

I. *Murder and Attempted Murder Convictions*

Turner argues that the record does not contain substantial evidence supporting the finding that she had the intent to kill. We agree. Consequently, we must reverse her murder and attempted murder convictions.

In resolving a substantial evidence claim, we review "the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128.) We resolve all conflicts in the evidence and credibility questions in favor of the verdict. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.'" (*Ibid.*) "'A reasonable inference, however, "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence."'" (*People v. Raley* (1992) 2 Cal.4th 870, 891.)

The People prosecuted Turner under the theory that she directly aided and abetted the charged murders and the attempted murder. A person directly "'aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or

10

facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Marshall* (1997) 15 Cal.4th 1, 40 (*Marshall*).) "'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).) But standing alone, mere presence at the scene of the crime or failure to prevent its commission does not establish direct aiding and abetting. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90.)

When the crime at issue requires specific intent, a direct aider and abettor must share the specific intent of the perpetrator. (*People v. Lee* (2003) 31 Cal.4th 613, 624.) In the case of attempted murder, the accomplice must know of and share the perpetrator's specific intent to kill. (*Ibid.*) Similarly, with respect to murder, the accomplice must "know [of] and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) In an express malice case like this one, that means the accomplice must act with intent to kill. (§ 188, subd. (a)(1); *People v. Gentile* (2020) 10 Cal.5th 830, 844.)

Even viewing the record in the light most favorable to the verdict, the record in this case does not contain substantial evidence that Turner knew of and shared the shooters' intent to kill. Turner followed the lead car, parked across the street, turned off her headlights, and crept forward behind James as he walked toward Ramirez. She also followed the lead car as it fled the scene. The jury could have reasonably inferred from this evidence that Turner coordinated with James and was acting as a lookout for him.

11

That satisfied the requirement that she aided the perpetrator's crime "by act or advice." (*Marshall*, *supra*, 15 Cal.4th at p. 40.)

Turner's intent, however, is a different matter. When a person serves as a lookout for others who commit a crime, the jury can often infer from the evidence that the lookout intended to aid and abet the crime committed. But here, the record contains affirmative evidence that James attempted to rob Ramirez before shooting him. The surveillance video showed that James walked past Ramirez, turned around, then approached Ramirez. The two appeared to exchange words, Ramirez tried to walk away, and James then shoved him. At trial, Ramirez testified that he recalled the shooter asking him for money and threatening to kill him, and he provided a written statement to the same effect.

On this record, any inference that Turner intended to aid a killing rather than a robbery amounts to pure speculation, in the absence of other evidence of Turner's intent to kill. (*Marshall*, *supra*, 15 Cal.4th at p. 35 ["mere speculation cannot support a conviction"].) And the record is devoid of such evidence. There is no evidence that she was armed with a deadly weapon. There is no evidence that she knew James and Eddington were armed with guns. In her recorded phone calls discussing the shooting, she indicated only that she was present, heard shots, and fled the scene. There is evidence that Turner and James had some sort of personal relationship—it is unclear whether they were romantic partners or friends—but that alone does not support a reasonable inference that she knew he intended to commit murder and shared that intent. Moreover, James's rap lyrics about shootings and being "known for the pistol" do not

12

permit an inference that James was, in fact, known for committing shootings. The gang expert testified on direct examination that gang members commonly rap about violence that they have not committed, and he did not believe lyrics were true without evidence corroborating them. There is no evidence that James was ever involved in a shooting before.

The evidence that Turner knew of and shared Eddington's intent to kill is even thinner. Eddington shot Bartolo and Domingo after they witnessed James's crime and as James was fleeing. When Eddington shot his victims, Turner was at the corner where Ramirez had fallen, and her car was facing away from the events. There is nothing but speculation to suggest that Turner knew Eddington intended to kill anyone, much less that she shared that intent. Again, "'[m]ere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof.'" (*People v. Anderson* (1968) 70 Cal.2d 15, 24.) And although Turner had some kind of personal relationship with James, there is no evidence that she was similarly close to Eddington.

The People's gang evidence does not fill the evidentiary gap in the record. Substantial evidence shows that Turner was an associate of the 1200 Blocc Crips and James's smaller Bogart squad, James and Eddington were members of the gang, and the shooting occurred at a stronghold of a rival gang. All of that evidence was critical to proving the gang participation offense and the gang enhancement. But as our Supreme Court has observed, "'gang evidence standing alone cannot prove a defendant is an aider and abettor to a crime.'" (*Nguyen*, *supra*, 61 Cal.4th at p. 1055.)

13

*Nguyen* illustrates the type of gang evidence that may, in combination with incident-specific evidence, constitute substantial evidence of the accomplice's intent to kill. Even in that case, however, the Supreme Court observed that whether there was substantial evidence of the accomplice's liability was a "close" question. (*Nguyen*, *supra*, 61 Cal.4th at p. 1056.) The gang evidence in the present case is less strong than that in *Nguyen*.

The *Nguyen* defendant and the attempted murder victim were from rival Asian gangs. (*Nguyen*, *supra*, 61 Cal.4th at pp. 1026-1027, 1053.) The defendant was riding in the back seat of a car, and the shooter was in the front passenger seat. The defendant's car followed the rival gang member's car, and the defendant and his associates stared at the rival gang member as they passed the rival's car. (*Id.* at p. 1053.) When the two cars stopped at an intersection, the defendant's associate shot the rival. (*Ibid.*) A few days later, the defendant asked another member of the rival's gang, "'What's up with the cops?'" (*Id.* at p. 1054.) The gang expert testified that Asian gangs did not claim particular turf but went around the community hunting for their rivals. (*Ibid.*) He explained that gang members would be expected to back each other up in a shooting, whether that meant committing an assault or a shooting or taking over the driving of the car. (*Ibid.*) In addition, the defendant's gang and the victim's gang "were in a state of war, and members of both gangs were expected to be able to engage in gunfights with their rivals 'at a moment's notice.'" (*Ibid.*) The *Nguyen* court held that "[a]lthough the issue [was] close" (*id.* at p. 1056), the incident-specific evidence in the context of the gang evidence permitted the jury to infer that the defendant knew of the shooter's intent

14

to kill, shared that intent, and aided the shooter by spotting potential targets. (*Id.* at p. 1055.)

In contrast to *Nguyen*, here the record contains no evidence that associates of the 1200 Blocc Crips were expected to back up gang members by shooting someone or to engage in gunfights with the gang's rivals at a moment's notice. There is no evidence that even full-fledged members were expected to undertake such actions. The gang expert's statement that there were "a lot of shootings" in 2015 between the 1200 Blocc Crips and an Eastside Riva clique is not analogous. That observation says nothing about whether each member or associate would necessarily be armed and ready to shoot at all times. And most importantly, the record here contains an affirmative, nonspeculative basis for concluding that Turner intended to aid a robbery rather than a killing, whereas there was no evidence that the *Nguyen* defendant intended to aid some crime other than murder. If *Nguyen* presented a close case of substantial evidence, this case presents only speculation and unreasonable inferences as to Turner's intent to kill.

In sum, on this record, there was no nonspeculative basis to conclude that Turner intended to aid and abet murder or attempted murder rather than robbery. Accordingly, the jury's finding that Turner harbored an intent to kill is not supported by substantial evidence. We therefore must reverse her convictions for murder and attempted murder in counts 1 through 3. (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1262 [conviction not supported by sufficient evidence violates constitutional due process guarantees and is invalid].) The attached special circumstance findings, gang enhancements, and firearm enhancements must also be vacated.

## II. *Gang Participation Conviction*

Turner also argues that her conviction for participation in a criminal street gang is not supported by substantial evidence. Given that this conviction also required an intent to kill, we agree.

The gang participation offense includes three elements: "First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.)

As to the third element, "[o]ne may promote, further, or assist in the felonious conduct by at least two gang members by either (1) directly perpetrating the felony with gang members or (2) aiding and abetting gang members in the commission of the felony." (*People v. Johnson* (2014) 229 Cal.App.4th 910, 920-921.)

The trial court instructed Turner's jury on the three elements, including that the People had to prove she directly perpetrated felonious criminal conduct or aided and abetted gang members in felonious criminal conduct. The court also explained that "[f]elonious criminal conduct means committing or attempting to commit any of the following crimes: Murder [section 187, subdivision (a)], and Attempt Murder [sections 664, 187]." In addition, like the general aiding and abetting instruction, the gang participation instruction told the jurors that aiding and abetting required the accomplice to know of and share the perpetrator's specific intent.

16

There was no dispute at trial that Turner was not the direct perpetrator of the murders or the attempted murder, so the instruction required the jurors to find that Turner directly aided and abetted at least one of those crimes with intent to kill. And for the reasons already explained, that finding is not supported by substantial evidence. Accordingly, we must also reverse Turner's gang participation conviction in count 4.[4]

## DISPOSITION

The judgment is reversed, Turner's convictions on counts 1 through 4 are reversed, and the attached special circumstance findings, gang enhancements, and firearm enhancements are vacated.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ _____
                                                                    J.


We concur:

RAMIREZ _____
                            P. J.
RAPHAEL _____
                            J.

---

[4] Given our resolution of the intent to kill issue, we need not reach Turner's claim that the evidence was insufficient to support the finding that she acted with premeditation and deliberation. Nor need we reach her claims that (1) the court abused its discretion by failing to discharge a juror to whom Turner's brother spoke; (2) the prosecutor committed misconduct in closing argument; (3) the court abused its discretion by imposing consecutive sentences for murder and attempted murder; (4) the sealed reporter's transcript of a hearing regarding discovery (§ 1054.7) requires our independent review; and (5) the gang enhancements and gang special circumstance findings must be vacated, and her gang participation conviction must be reversed, in light of recent amendments to section 186.22 (Stats. 2021, ch. 699 (Assem. Bill No. 333), § 3, eff. Jan. 1, 2022).

17